## JORDON v. UNITED STATES.
### No. 6686.

United States Court of Appeals for the
District of Columbia.
Argued Oct. 6, 1936.
Decided Nov. 9, 1936.

Richard F. Bowman and W. B. O'Connell, both of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., and Roger Robb, Asst. U. S. Atty., both of Washington, D. C., for the United States.

Before VAN ORSDEL, GRONER, and STEPHENS, JJ.

GRONER, J.

Appellant was convicted of murder in the first degree under an indictment charging that on April 3, 1931, he and Edith Dodsworth murdered Lizzie S. Jaynes.

Appellant was tried alone, the Dodsworth girl never having been apprehended.

The killing occurred in a restaurant in Columbia Road, N. W., in Washington City. On the night of April 3, about 11:30, two masked men with drawn pistols entered the restaurant. One of them was tall, the other short. The testimony of the eyewitnesses to the killing is that the tall man went half way back the length of the counter to where one of the women clerks was standing. The short man walked behind the end of the counter to the cashier's cage, some eight or ten feet from the door, where Mrs. Jaynes, the cashier, was seated on a high chair. While the short man was taking the money out of the cash register, the street door of the restaurant was opened (presumably to admit a customer) and almost instantaneously a shot was fired from the pistol in the hands of the short man, who then "was in very close proximity to Mrs. Jaynes, almost touching her." Mrs. Jaynes screamed, "Oh, God, I am shot"; after which the two men ran out. As they were leaving the restaurant, the tall man said to the short man, "Boy did you shoot her?" and the short man replied, "No; she isn't hurt." Mrs. Jaynes died two days later from the gunshot wound.

In August, 1931, appellant and Edith Dodsworth were arrested for questioning

in connection with the killing. Both made statements to the effect that they had at one time discussed robbing the restaurant but had abandoned the idea and that they were not there on the night of April 3 or at any other time. They were held in jail for several months, and an indictment charging them with conspiracy to commit robbery was submitted to the grand jury but no true bill was found. They were then released, and the murder and robbery continued a mystery until May 5, 1935, when appellant, who had moved to Mount Vernon, N. Y., wrote the United States attorney in Washington stating that he was contemplating marriage and wished to know if there was any possibility of another or further investigation in connection with the case. The letter being referred to the police department, a detective sergeant from Washington was sent to interview him. Appellant was brought to police headquarters in Mount Vernon and questioned. Late the same night (May 16, 1935) he made and signed a statement in which he said that he and Edith Dodsworth had planned to rob the restaurant; that on the night of April 3, 1931, he met Edith and a man whom he did not know and they drove up to the restaurant; that he and the unknown man, their faces covered with masks, and with pistols in their hands, entered the restaurant and "held it up," and that just as they were about to leave the premises and were backing out toward the front doorway the door opened and struck appellant's accomplice, whose pistol then discharged. Both then joined Edith Dodsworth and drove away, and later divided the money, which amounted to $101. Appellant was arrested and brought back to Washington, and during the railroad trip requested the officer who had him in charge to bring the husband of the murdered woman to the jail that he might talk with him. This was done, and Mr. Jaynes, who was called as a witness for the government in the trial, testified that appellant first said to him, "I am sorry about this matter"; that he then said that he and another man went into the restaurant and that he (appellant) remained at the front by the cash register and that the other man walked some distance down behind the counter; that, when the other man came back and was passing him, the shot was fired and that the pistol that was fired was then in his (appellant's) hand. Subsequently appellant made another written confession to the local police in which he said, "As we went in [the restaurant] I pulled this .25 calibre automatic from my pocket. * * * There was a lady at the cash register. I said to her 'this is a holdup'—and she opened the drawer of the register and handed over the contents. The other man with me kept on to the rear of the Tea Shop, and stood there. The money was handed over to me by the lady at the register. I put the money in my pocket and then called 'let's go' to him and I still had my gun on the woman who was at the cash register. When he [the accomplice] came to the front of the tea shop and as he came near I started to back away to the front door and just as I got close to the front door, either the door opened behind me or I got the jimjams and became excited and I fired one shot and this was an unintentional shot and I did not mean to fire at no one," etc.

Jean Beierholm, the young woman in Mount Vernon whom appellant hoped to marry, was called as a witness by the government and testified that during his courtship of her appellant had told her that he had something on his mind which kept him from sleeping at night and that he wished to tell her about it; that what he told her was that on the night of the killing he was broke and had told a girl whom he knew he would like to hold up a bank; that they went to the place of the killing and there was some trouble and a woman was shot; but that he had nothing to do with it and was innocent; and that she (witness) had said to him that if she (witness) were in his place, she would want to get a thing like that off her conscience; and that subsequently he told her he had written the letter to the District Attorney.

On the trial appellant denied that he had ever been in the restaurant or that he had any part in the killing. He repeated what he had formerly said to the officers on his first arrest, namely, that he had discussed the matter of robbing the restaurant with Edith Dodsworth, but that in thinking it over he had concluded that the risk was too great and had given it up.

The jury returned a verdict of first-degree murder, and on this appeal the errors assigned and urged are:

First, that the verdict was contrary to the weight of the evidence;

Second, that the jury was illegally constituted;

Third, that the jury misunderstood the instructions of the court through mistake;

Fourth, that the verdict was not the intentional verdict of at least one of the jurors.

Enough has been said, we think, to show that appellant could neither have been charged with the murder nor convicted of the murder, except for his own statements. That these were voluntary and were made without coercion or promise, is admitted. In the last of them, and in his conversation with the husband of the deceased, he admitted taking part in the robbery and firing the fatal shot; and if the jury believed this, as they had every right and reason to do, there remained then only the question whether appellant was guilty of murder in the first or in the second degree. And this brings us to a consideration of the statute defining murder in the District of Columbia. It provides:

(Section 21, Title 6, D.C.Code 1929.) "Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate any offense punishable by imprisonment in the penitentiary, kills another, is guilty of murder in the first degree."

(Section 23.) "Whoever with malice aforethought, * * * kills another is guilty of murder in the second degree."

In many of the states a killing committed in an attempted burglary or robbery is murder in the first degree, and it has been held that under the statutes in those states the offense is complete even though there was no intent or desire to kill. People v. Smith (Sup.) 187 N.Y.S. 836, and State v. McNeal (Mo.Sup.) 237 S.W. 738, are typical of this class of cases.

■ But the statute in the District of Columbia includes the word "purposely," and, as we read it, makes it incumbent on the prosecution to show that an accused purposely, in perpetrating or attempting to perpetrate an offense punishable by imprisonment in the penitentiary, kills another. The word "purposely," we take to mean, with design or intentionally. The Supreme Court of Ohio, where the language of the statute is similar to that in the District of Columbia, has reached the same conclusion. Robbins v. State, 8 Ohio St. 131; Turk v. State, 48 Ohio App. 489, 194 N.E. 425; State v. Turk, 129 Ohio St. 245, 194 N.E. 453. The District Judge correctly instructed the jury in this respect. He said that, if the killing was done by appellant while perpetrating the crime of robbery, it was murder in the first degree if the killing was done purposely; if, on the other hand, in perpetrating the crime the killing was not done purposely but by accident or otherwise, appellant was not guilty of murder in the first degree. This purpose to kill, in the view we take of the statute, is a state of mind which must be proved as a fact before there may be a conviction of first-degree murder under the statute, but proof of purpose need not be direct; it may be inferred from the circumstances attending the killing. And this brings us, finally, to a consideration of the question whether the evidence was sufficient to sustain the verdict of the jury.

■ As we have seen, appellant in all his confessions admitted that he had gone into the restaurant for the purpose of committing robbery and that he did in fact commit robbery. He also admitted in his final confession that he fired the fatal shot, but he denied that he did it intentionally. In the statement to the Washington police he said, as we pointed out, that, after he had got the money and was backing toward the front door, either the door opened behind him or he got the "jimjams" and became excited and fired the shot unintentionally. If the jury believed his statement, he should not have been convicted of murder in the first degree; but it is evident the jury did not believe him. And in view of the different statements made by appellant at different times, this was a reasonable rather than an unreasonable attitude of mind on their part.

In this view the jury could have reached their verdict on part of the testimony of Mildred Colt, an eyewitness to the shooting, who said that the shot was fired simultaneously with the act of taking the money from the cash drawer, and that the man who fired was standing close to and almost touching his victim when the shot was fired. This, and the fact that appellant himself had admitted that during all of this time—that is to say, from the demand for the money to his backward movement toward the door—he still had the pistol leveled at the woman at the cash register, were enough, in our opinion, to justify the jury in concluding that either impatient at the delivery of the money, or because of the possibility of interference from the outside, appellant had intentionally fired the shot. We think it cannot be doubted that, in the circumstances we have narrated, the jury were justifiable in rejecting

that part of appellant's statement in which he claimed he fired the shot unintentionally; and, having rejected that part of the statement, we are also of opinion that the jury could from the evidence have reached the conclusion that appellant fired the shot purposely. Undoubtedly they had a right to consider all the facts in the case and judge appellant's purpose from his acts.

■ Second. The assignment of error that the jury was illegally constituted grows out of the fact that after the jury had been impaneled, and after the case had been tried and the verdict rendered, it was ascertained that one of the jurors was a notary public for the District of Columbia; and it is now claimed that this was a constitutional disqualification under the doctrine laid down by us in Wood v. United States, 65 App.D.C. 330, 83 F.(2d) 587. But the answer to this is that the office of notary public does not in itself create a relationship to the federal government such as we held in Wood v. United States was sufficient to disqualify a juror.

■ Third. The third and fourth assignments may be discussed together. They are based upon a statement made by one of the jurors to the trial judge after the case had been tried and verdict rendered. The day after the trial a member of the jury sought an interview with the trial judge and stated to him, in the presence of counsel for the United States and the defendant, that the other eleven jurors had misunderstood the court's instructions and believed that they could only find a verdict of first-degree murder or a verdict of not guilty. The juror himself stated that he had understood the judge to charge that, if the fatal shooting was an accident, or if it was not purposely done, the jury should find a verdict of second-degree murder, but that the other jurors insisted to the contrary; and that, after laboring with them for 24 hours and suggesting that they ask additional instructions from the court which the foreman declined to request, he yielded to their view and voted with them for a first-degree verdict. None of the other jurors was examined, so that the statement of the juror that all the others misunderstood the court's instructions is wholly uncorroborated. In addition to this, the court's charge on this subject was clear and specific, and the jury were repeatedly told that if the killing was done in the perpetration of robbery, but not done purposely, it was murder in the sec-

ond degree. It is difficult, under these circumstances, to reach the conclusion that the jury acted either ignorantly or willfully. And this was the view of the judge below who, after hearing the statement of the juror, declined to order a new trial on the ground of the misconduct of the jury.

Besides, the jury had the case under consideration 24 hours and when the verdict was read in the court, each juror was polled separately and each replied that the verdict as read was his verdict. To set aside the verdict now on the ground of mistake on the part of the jury would, we think, be improper, and, as is often said in like circumstances, to establish a practice replete with dangerous consequences. The universal rule in the federal courts is that the testimony of a juror may not be received to prove misconduct of himself or his colleagues in reaching a verdict. McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Davis v. United States (C.C.A.) 47 F.(2d) 1071, 1072; Lancaster v. United States (C.C.A.) 39 F. (2d) 30, 33; Ramsey v. United States (C. C.A.) 27 F.(2d) 502, 504; Hicks v. United States, etc. (D.C.) 14 F.(2d) 316, 317; Stewart v. United States (C.C.A.) 300 F. 769, 788. And, while we are unwilling to go to the extent of saying that this rule is inexorable, or that in a case involving—as is true here—the life of an accused, it would, without regard to the character of the irregular or improper or illegal acts of the jurors, be considered inflexible, we think the uncorroborated statement of the juror, coupled with the facts we have referred to, does not warrant an exception. And even more we are convinced that it would be improper to interfere with the verdict on the ground that it did not represent the true verdict of all 12 jurors. It is perfectly clear from the statement made by the complaining juror that *he* was under no misapprehension as to the law laid down by the court; and it is equally clear that, whatever doubts he may have had, he finally intended to render a verdict of first degree murder.

■ On the whole case, we think there can be no shadow of doubt that appellant committed the robbery, and, in the act of committing the robbery, fired the fatal shot. And, that we might have reached a different conclusion from that of the jury on the question whether he fired purposely

68

or not, will not, we think, justify us in substituting our own views on the weight of the evidence in this respect for that of the jury, since, as we have pointed out, there was evidence on which the jury's verdict can legally be rested. In these circumstances, we must affirm the judgment of the trial court.

Affirmed.