**Mario R. VILLACRES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 7066.**

District of Columbia Court of Appeals.

Argued Aug. 14, 1974.

Decided May 11, 1976.

W. Gary Kohlman, Washington, D.C., appointed by this court, for appellant.

Jeffrey T. Demerath, Asst. U.S. Atty., Washington, D.C., with whom Harold H. Titus, Jr., U.S. Atty., at the time the brief was filed, and John A. Terry, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before KELLY, KERN and YEAGLEY, Associate Judges.

KERN, Associate Judge:

Appellant, convicted after trial by jury of murder in the second degree, unlooses on appeal a stream[1] of objections to his conviction composed of four estuaries of argument. Specifically, he argues:

First, that certain events occurring before trial both within and without the courtroom *required* the trial court to hold a hearing to determine (a) whether he was competent to waive his right to counsel and proceed to defend himself and (b) whether his waiver of counsel had been knowing and intelligent.

Second, that the trial court during trial erred in forbidding appellant, proceeding pro se, to cross-examine an officer who had conducted before trial a lie detector test of appellant and who would have testified, if the subject had been opened up on cross-examination, that appellant had sought to manipulate the test results.

Third, that certain comments by the prosecutor in the presence of the jury during trial and to the jury during argument, when taken together, constituted such prejudicial misconduct as to require a new trial; and

Fourth, that the trial court's use of the *Allen* charge in its supplemental instruction to the jury after the jury had deliberated more than three hours and had then at 6:15 p. m. advised "it is unable to reach a unanimous verdict," was under the circumstances so impermissibly coercive as to deprive him of his constitutional right to trial by jury. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

We sketch briefly the government's evidence. Appellant's mother owned a three-story house in northwest Washington in which the deceased, Jesus Guiterrez, was a boarder on the third floor. In the summer of 1972, appellant, although not living there, was a frequent visitor. On the morning of August 1st, so far as his mother knew, only she, appellant, and a boarder, Mrs. Ayala, were in the house. Appellant's mother heard noises sounding like gunshots coming from upstairs and, upon investigation, she saw appellant standing on the second floor. When she asked him what had happened, he replied, "Go downstairs; there's nothing there, nothing."

The continued whining and crying of Mrs. Ayala's dog brought Mrs. Villacres to the third floor around noon where she discovered the decedent's body in the hallway with considerable blood in the immediate

---

1. The initial brief exceeds 100 pages in length. Appellant requested and was granted leave to exceed the usual 50 page limit. See D.C. App.R. 28(g).

vicinity. She found appellant in the front yard, asked him if he knew who was responsible and was told, "I don't kill nobody, I don't know who is there." Appellant then called the police.

Appellant's brother, Patricio, asked appellant two days later if he had a gun. Appellant produced a pistol, a .38 caliber Colt, from which he removed four live rounds of ammunition and two spent shells and which he attempted to clean. Appellant explained he had twice fired the weapon in the backyard during the month before. Patricio Villacres subsequently called the Homicide Squad and turned the pistol over to them. Appellant's sister, Margarita, confirmed her brother's account about appellant's pistol and added that appellant had some ten months before been selling marijuana and she told the police he "might have been" selling heroin, also.

A police fingerprint analyst arriving on the scene found appellant's prints near the top of the closet door in the hallway behind which decedent's body had been found. Another officer from the Mobile Crime Laboratory found the decedent in a semi-seated position with a bullet hole below each of his eyes and blood "sprayed the entire length of the body and on the opposite wall where the feet were." The Deputy Medical Examiner opined that one of the two fatal shots had been fired at close range.

An officer from the Firearms Identification Division determined that the two slugs removed from or near the body had been fired from a .38 caliber Colt pistol and were of the same unusually heavy weight as the live rounds contained in a box of revolver ammunition identified by Patricio Villacres as belonging to appellant. Since the slugs inflicting the fatal wounds were copper-coated, it could not be determined whether they came from appellant's pistol but they were fired from a .38 Colt pistol.

Another police officer testified concerning a comment made by appellant, after voluntarily coming to the police station,

during the course of undergoing a lie detector test. Appellant's comment was that he had stopped selling marijuana as a result of his suspicion that decedent was an informant for the police and that he had "passed" that word to others.

It may be seen from the summary of evidence that the government's theory of the case was that appellant in order to remove an obstruction to his narcotics trade plotted and then carried out the murder of Jesus Guiterrez. While no eyewitness to the crime was available, the circumstances developed by the government's evidence appeared sufficient to the jury to convict appellant of murder in the second degree.

We turn now to appellant's arguments for reversing the conviction—one of which we find persuasive. Having examined the prosecutor's argument in summation to the jury and his questioning during trial of appellant and appellant's mother, we are constrained to find misconduct on his part. Upon careful consideration of the record we also conclude that the misconduct was so egregious as now to require reversal of the conviction.

We begin with the general comment that the prosecutor's closing argument to the jury in this case is a painful example of the kind of summation, long on personal opinion and comment and short on review of the evidence, which Circuit Judge now Chief Justice Burger condemned in *Harris v. United States,* 131 U.S.App.D.C. 105, 402 F.2d 656 (1968). He commented aptly:

[L]awyers should train themselves to eschew opinions in the course of arguments to juries because this diverts them as well as jurors from their respective functions. By avoiding expressions of personal opinions, the advocates will tend to concentrate on facts, issues and evidence, and make reasoned, even if vigorous, arguments. . . . The personal evaluations and opinions of trial counsel are at best boring irrelevancies

and a distasteful cliche-type argument. At worst, they may be a vague form of unsworn and irrelevant testimony. [Id. 131 U.S.App.D.C. at 108, 402 F.2d at 659.]

2. Thus, the prosecutor's argument is chock full of such irrelevant comments as appellant's sister is "a senior in college" and his brother is "going to school and working . . . [and] a true gentleman" (R. 892) ; appellant's family "was going to testify, or, regrettably, they were going to have to go to jail until they would testify" (R. 899) ; appellant's mother was "a wonderful mother" and appellant's family was "a protective Spanish Catholic family" (R. 937) ; appellant's mother was crying during the trial (R. 890, 942), but "mama can't help Mario now." (R. 942) The prosecutor referred to his own child falling down the stairs (R. 935), his own name being the same as that of the baseball hero Jackie Robinson (R. 939), incidents from the 1972 World Series (R. 940), and the TV program "Columbo". (R. 944–45).

3. Thus, for example, the prosecutor referred to decedent: "He came to this country a while back, and he was a very simple, small man . . . . He lived in a very small apartment here at Lanier Place until August 1st, 1972, and the real baffling part to his soul, wherever it may be, was that he died . . . ." (R. 885.)

"Do you believe this—this man [appellant]? Well, as you try to believe him, remember Jesus. He comes to this country ; he has a little room ; he's up there, getting ready to mail a check of $120 back to Spain, and, 'Boom, boom' ; he's no more." (R. 891.)

"We know what happened. He [the decedent] was dead. He crumpled straight down to the floor and his right foot collapsed against the wall. But those cold eyes that you see right now, those eyes—do you see that face? That's the face. You can picture, can't you? " (R. 902.)

"Jesus Guiterrez will never speak again and I am his voice at this time, and I ask you to listen to me. Oh, how Jesus would love to have the opportunity to be the prosecution . . . [b]ut Jesus never got that privilege, and what I say, I ask you to listen to, because Jesus has lost the most sacred right there is. . . . You take Jesus' heartbeat and he is no more, and he cannot speak ; and this man [pointing to appellant] took that heartbeat—." (R. 904–05.)

"He [the decedent] was a humble cook that lived in a simple kingdom in a little apartment and that died and never knew why." (R. 907.)

The Assistant United States Attorney's jury argument here was just such a distasteful and improper melange of "boring irrelevancies,"[2] "cliche-type argument,"[3] and "unsworn and irrelevant testimony."[4]

"I ask you to cherish the memory of Jesus Guiterrez, though you don't know him. You are his protectorate, and when someone dies . . . it's got to be stopped, and it can't be stopped unless it is stopped in that jury box. And I ask you to do that . . . ." (R. 908.)

"You have to comfort the memory of Jesus, soothe the community's needs, and reach a decision of guilty in the first degree murder if you believe the irrebuttable circumstances and circumstantial evidence that we have given to you." (R. 935.)

"My God, he's dead [the decedent], but he wanted to make sure he got equal time to both eyes, so he pulled that trigger and this little man with this humble little room here, with family pictures all over it . . . and a little Santa Claus hanging off of a lamp— that man was dead." (R. 942.)

"It is so ironic that Mario [appellant] would shoot this man . . . by a door with a little sign . . . 'Let's make tomorrow better.' Well, there will be no tomorrow for Jesus Guiterrez, and you know why." (R. 942.)

"But, if it takes you a decade, don't you forget what happened to that man. You are his protector now." (R. 942.)

"Don't forget Jesus, and don't forget that tomorrow is dead and done for Jesus, and he [appellant] killed him. First degree murder." (R. 947.)

4. The prosecutor in his summation repeatedly called to the jury's attention appellant's demeanor in the courtroom while *off* the witness stand—a practice condemned by this court as the presentation of unsworn testimony, *Hyman v. United States*, D.C.App., 342 A.2d 43 (1975), and by the federal circuit court as adducing evidence that is legally irrelevant, *United States v. Wright*, 160 U.S.App. D.C. 57, 60–61, 489 F.2d 1181, 1184–85 (1973).

Thus, the prosecutor at various times said to the jury: "He sits there now with a smirk on his face. He's denied it all along. . . ." (R. 890) ; "Well, there was a threat to Mario named Jesus. Look at him smirk. . . . " (R. 906) ; "He [appellant] goes to his closet, or wherever he kept that .38 revolver, and he picks it up. . . . And, oh, he's got some thoughts in his mind, doesn't he? He's smirking like he is now." (R. 941.)

We now proceed to focus on three misstatements of the evidence made by the prosecutor which, when examined in context, cannot be excused as an honest misunderstanding of the substance of previous testimony because of haste or confusion. *See King v. United States,* 125 U.S.App. D.C. 318, 330, 372 F.2d 383, 395–96 (1967).

First, the prosecutor stated to the jury during argument in allegedly recounting for them the conversation between appellant and his mother after her discovery of the body (R. 903):

> Perhaps that's why Mario said to his mother "Are you sure he's dead? My God, *I shot him in each eye,* he ought to be." [Emphasis added.]

The prosecutor thereby presented to the jury a confession by appellant which was never in evidence. Such a misstatement could not have been inadvertent because the prosecutor had conceded before trial (R. 239) that an incriminatory statement by appellant after his arrest was *inadmissible* because it had been taken in violation of *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964). Thus, he was well aware of the limitations extant on the use of self-incriminating statements by appellant.

The next misstatement of evidence was the prosecutor's recounting for the jury in summation what had occurred when appellant and his mother met on the steps after she had heard gunshot noises (R. 888):

> And when she [appellant's mother] turned at the top of the steps, there was Mario, facing her across from the bathroom, at the banister. . . . She knows that [the shots] means Mario shot that man and she knows that when she confronted Mario on the banister there, *Mario said, "Forget what you heard. Forget it, Mother. Go back downstairs; don't tell anybody."* [Emphasis added.]

The prosecutor went on (R. 889):

> [W]e see that Mario Villacres then called the police, but he told his mother before he called the police, *"Don't tell anyone what you heard;* . . . Forget about it." [Emphasis added.]

The record in fact reflects that appellant's mother, a government witness, did not so testify at all. Rather, her testimony (R. 407) was "I go upstairs and I look at my son. I ask him, 'What happened,' and he say, 'Nothing; nothing.' *That's all."* [Emphasis added.] Indeed, even when the prosecutor pressed appellant's mother by posing the question on direct examination, *viz.,* "What, if anything, did he say about 'Forget what you heard'?", the witness's answer was in the negative. (R. 407.)

We note that the prosecutor had in his opening statement expressly asserted (R. 394):

> Now, Mario Villacres had told his mother not to tell the police what she had seen when she saw him up near that banister previously.

Given the prosecutor's assertion in his opening statement of what he would prove and his unsuccessful effort to adduce such proof when examining his own witness, appellant's mother, we cannot say that his statement made later in closing argument was an isolated aberration resulting from the pressure of the moment or an honest misunderstanding of the evidence.[5]

Finally, the prosecutor in order to draw an analogy between the "execution" of the decedent, Jesus Guiterrez, and the crucifixion of Christ (R. 906–07) asserted (R. 906):

> [I]t's interesting that Mario called him Jesus [English pronunciation], not Jesus [Spanish pronunciation]. You see, there's an analogy . . . to Pontius Pilate . . . . So what do you do, crucify him, get rid of him. . . . Well, there was a threat to Mario named Jesus [English pronunciation]. . . .

---

5. Appellant unequivocally testified in his own defense that when his mother told him of her discovery of the body he calmed her and called the police. (R. 782.)

[A]nd if he can just crucify Jesus [Spanish pronunciation] or Jesus [English pronunciation] . . . Mario can start selling his heroin . . . . And you better believe that Jesus [English pronunciation] was crucified when Jesus [Spanish pronunciation] Guiterrez was executed.

The record is devoid of any evidence as to how appellant pronounced decedent's name. Rather, the record reflects that the source of the prosecutor's argument was the prosecutor's *own assertion* when he questioned appellant on cross-examination. The pertinent colloquy was (R. 806):

> Q. Did you like Jesus [Spanish pronunciation]? *You call him Jesus* [English pronunciation].
>
> A. I—respected him as a man. [Emphasis added.]

Thus, the prosecutor simply used his own statement during trial to provide the "evidentiary" basis for a highly inflammatory argument to the jury. *See United States v. Hawkins,* 156 U.S.App.D.C. 259, 480 F. 2d 1151 (1973); *United States v. Phillips,* 155 U.S.App.D.C. 93, 476 F.2d 538 (1973).

When considering the prosecutor's misstatements of evidence described here, we advert to the conclusion reached by Judge Robb in considering this same prosecutor's argument in a criminal case arising in the federal circuit court. Judge Robb said:

> The prosecutor's conduct was not an isolated, momentary aberration occurring in the heat of trial, but was a deliberate, calculated and successful effort to prejudice the defendant by reference to matter that was not in evidence. Such tactics cannot be tolerated. [*United States v. Whitmore,* 156 U.S.App.D.C. 262, 266, 480 F.2d 1154, 1158 (1973).]

■ The applicable test in this jurisdiction in determining whether prosecutorial misconduct infects a verdict is to balance, on the one hand, the gravity of the misconduct, its direct relationship to the issue of innocence or guilt, and the effect of specific corrective instructions by the trial court, if any, against the weight of the evidence of appellant's guilt. *Smith v. United States,* D.C.App., 315 A.2d 163, 166, *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).[6] Applying this test, we are constrained to reverse the conviction and order a new trial.

■ First, the deliberate misstatements by the prosecutor constituted grave misconduct. Second, the introduction in those misstatements of (1) a "confession" on the part of the defendant, (2) an instruction by the defendant to his mother to suppress evidence, and (3) a basis enabling the prosecutor to compare the murder with the Crucifixion, bore a very direct relationship to the issue of guilt or innocence. Finally, the trial court overruled the numerous objections made by appellant's attorney-advisors during the prosecutor's summation and instructed the jury that "sometimes" counsel's memory "may fail" and "they may misstate something" and the jurors' recollection of the evidence should govern. (R. 949.) The court also instructed the jury that "statements and arguments of counsel are not evidence." (R. 953.) This general instruction, lacking specifics, was in our view inadequate to correct the harm from the misconduct.

We conclude appellant is entitled to a new trial. In light of our disposition of this case on the issue of prosecutorial misconduct we need not reach the other contentions raised on this appeal.

*Reversed.*

---

6. We are also mindful in determining the appropriate action to take in this case of the recent pronouncement by the Supreme Court, speaking through Mr. Justice Rehnquist, in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The precise issue posed there was whether a misstatement by the prosecutor in summation was such conduct as to amount to a violation of due process. The Court, in concluding not, admonished (at 648 n. 23, 94 S.Ct. at 1873):

> [W]e believe that trial courts, by admonition and instruction, and appellate courts, by proper exercise of their supervisory power, will continue to discourage [prosecutorial misconduct].