Andre **SELLARS**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 10508.

District of Columbia Court of Appeals.

Argued Jan. 4, 1977.

Decided April 27, 1979.

Kenneth H. Shepherd, Washington, D. C., for appellant.

Mary H. Weiss, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and William D. Pease, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before HARRIS and MACK, Associate Judges, and REILLY, Chief Judge, Retired.

HARRIS, Associate Judge:

A grand jury indicted appellant charging the second-degree murder of Epluribus Thomas, D.C.Code, 1973, § 22–2403; assault on his brother, Clyde Thomas, with intent to kill while armed, id., §§ 22–501, –3202; the lesser-included offense of assault with intent to kill, id., § 22–501; and carrying a pistol without a license, id., § 22–3204. Appellant was convicted by a jury of the manslaughter of Epluribus Thomas, id., § 22–2405, and of carrying a pistol without a license. He makes several attacks upon his convictions. None is persuasive; we affirm.

I

. The government's evidence was that the Thomases drove in Epluribus' car into the parking lot of a convenience store, intending to buy cigarettes. Clyde saw appellant approach, carrying two pistols. Epluribus got out of the car and exchanged some words with appellant about a debt which the latter owed him. Appellant then shot him fatally. Immediately thereafter, appellant turned on Clyde, who was standing outside the car. Appellant announced that he was going to kill Clyde, and shot him several times. After the shootings, appellant fled the scene in a car driven by his brother. As they drove off, appellant leaned out the window and shot a man

lying on the ground (apparently Epluribus). The body jumped when the bullet hit it. One government witness testified that appellant admitted to her that he had shot the Thomas brothers, but appellant had added that he thought Clyde had been reaching for a gun inside Epluribus' car.[1]

Appellant claimed that he acted in self-defense. He presented evidence that a few days before the shootings he had intervened in a fight to stop an assault by Clyde on another man, and that as a result of that intervention Clyde had threatened to kill him. He also testified that Clyde had a reputation for violence. On the day of the shootings, appellant met two acquaintances at the convenience store. One of those acquaintances, Merrill Logan, recently had been beaten by the Thomas brothers, and he advised appellant that the brothers were "out to get [appellant]." At that moment, the Thomas brothers drove into the store's parking lot. Epluribus started to get out of his car and told everyone to "freeze" or they would be shot. Appellant, thinking that the Thomas brothers were armed, took Logan's gun from a paper bag underneath the car next to him and also grabbed a second gun from Logan. He saw Epluribus reach for something in a bag and shot him, and then shot a second time when he spun around. He then ordered Clyde out of the car. When Clyde acted as though he was about to reach into the car, appellant shot him in the back. Appellant denied firing another shot into Epluribus as he drove away. Although a holster was removed from the trunk of Epluribus' car, neither Clyde nor Epluribus had been armed. The bag purportedly held by Epluribus was not recovered.

After the close of the evidence, the prosecutor and defense counsel gave their final arguments. During the prosecutor's summation, the following occurred:

[THE PROSECUTOR]: As that car pulled away he [defendant] took one of those guns and he put another shot into Epluribus Thomas.

Now, [the witness] knows that shot took effect because [Epluribus'] body jumped when it hit. Doesn't that tell you more than anything else in this case about what Mr. Andre Sellars had in mind?

You know, when a firing squad executes somebody, at least in some military republics and some dictatorships, they have what is called a coup de grace. That's a French expression—

[DEFENSE COUNSEL]: We object to it, Your Honor.

THE COURT: Objection overruled, sir.

[THE PROSECUTOR]: What it is when a man is shot by a firing squad, the leader of that firing squad then goes up to the man who is being executed and takes a pistol and puts one final bullet in that man's head to make sure he's dead. Andre Sellars as he drove, or as he rode out of that 7-11 parking lot with his brother driving, administered the coup de grace to Epluribus Thomas who was laying on the ground, just to make sure he was dead.

Doesn't that tell you more than anything what this man's intentions were? Thank you.

The next morning, before jury instructions were given, defense counsel proffered testimony by one George Cobb to the effect that after the shootings he saw Victoria Thomas, a sister of Clyde and Epluribus, talking with Clyde. Allegedly, Victoria then retrieved a gun from beneath the passenger seat of Epluribus' car and put it in her bag. The government took the position that if Cobb were permitted to testify, then it should be allowed an opportunity to interview Victoria and determine whether she also should be called. The trial court declined to reopen the case, finding the proffered testimony to be irrelevant.

The jury convicted appellant of the lesser-included offense of manslaughter of Epluribus and of carrying a pistol without a license, and acquitted him of the assault counts as to Clyde Thomas. The members of the jury were polled on the two convic-

---

1. On cross-examination, appellant admitted that he had not seen a gun.

tions. Each juror specifically agreed with the verdicts.

Several days later, the trial judge received a note from the jury foreman. It alleged that the jurors had agreed that appellant acted in self-defense, but that the verdict did not convey that agreement. The trial judge held a hearing in chambers, questioning each juror individually in the presence of the prosecutor, appellant, and defense counsel about the verdict. Three jurors reaffirmed the verdict as rendered. The foreman virtually admitted that he had changed his mind about appellant's guilt after the jury was discharged. The remaining jurors said they had believed appellant acted in self-defense and had intended the manslaughter verdict to reflect that conclusion. They apparently had misunderstood one portion of the court's charge, which read as follows:

> If you find that the Government has failed to prove beyond a reasonable doubt that this defendant did not act in self-defense, in connection with the actions he took against both Epluribus Thomas and Clyde Thomas, you must find the defendant not guilty.

The court denied relief and imposed sentence. This appeal followed.

## II

■ Appellant challenges the sufficiency of the evidence to sustain the manslaughter verdict. He appears to contend that the jury could have found the malice required for a murder conviction, or that the killing was a justifiable act of self-defense, but that it could not have found reckless "conduct involving extreme danger of death or serious bodily injury and gross deviation from the standard of conduct that a reasonable man would observe." *United States v. Dixon*, 135 U.S.App.D.C. 401, 407, 419 F.2d 288, 294 (1969) (LEVENTHAL, J., concurring); *see United States v. Bradford*, D.C. App., 344 A.2d 208, 215 (1975); *United States v. Dent*, 155 U.S.App.D.C. 278, 279, 477 F.2d 447, 448 (1973).

The jury, however, readily could have rejected appellant's claim of self-defense on the ground that his allegedly self-protective reaction was so excessive or unreasonable as to show the requisite culpability for manslaughter. *Pendergrast v. United States*, D.C.App., 332 A.2d 919, 925–26 & 926 n.4 (1975); *United States v. Wharton*, 139 U.S. App.D.C. 293, 301, 433 F.2d 451, 459 (1970); *see United States v. Dixon, supra*, 135 U.S. App.D.C. at 402–03, 419 F.2d at 289–90. *See also Carmichael v. United States*, D.C. App., 363 A.2d 302 (1976); *United States v. Dent, supra*. As the United States Court of Appeals observed in *United States v. Wharton, supra*:

> Appellant's jury may have recognized an obstacle to finding self-defense simply from the amount of force used to repel the deceased's attack. And if the jury rejected self-defense just because appellant imprudently misjudged the response necessary in the situation, his offense might well have been manslaughter, arising from the unreasonableness of the judgment he made. [139 U.S.App.D.C. at 301, 433 F.2d at 459 (footnote omitted).]

This doctrine permits a jury to find that homicidal conduct in cases like the present one constitutes manslaughter. The record contains ample evidence that appellant at a minimum acted with grave recklessness.

## III

■ The trial prosecutor's remarks, made over defense objection, about execution and a "coup de grace" might better have been left unsaid. Similar remarks have been condemned in the past. *See United States v. DeLoach*, 164 U.S.App.D.C. 116, 124, 504 F.2d 185, 193 (1974); *United States v. Jones*, 157 U.S.App.D.C. 158, 164, 482 F.2d 747, 753 (1973); *Taylor v. United States*, 134 U.S.App.D.C. 188, 413 F.2d 1095 (1969); *cf. Villacres v. United States*, D.C.App., 357 A.2d 423, 427–28 (1976). The government (as it generally does in cases of alleged prosecutorial excess) notes that "a criminal trial is not a minuet." *Taylor v. United States, supra*, 134 U.S.App.D.C. at 189, 413 F.2d at 1096. However, as Judge (now Chief Justice) BURGER pointed out in *Taylor*, prosecutors should adhere to standards

which "uphold the dignity of the Government." *Ibid.*

■ A comment of this sort, however, does not automatically call for reversal. *See, e. g., United States v. Jones, supra,* 157 U.S.App.D.C. at 164, 482 F.2d at 753. An appellant is entitled to a new trial based upon prosecutorial misconduct only if, after balancing the gravity of the prosecutorial misconduct against the weight of the evidence against appellant, we are unable to say that the conduct did not substantially sway the judgment of the jury. *See Miles v. United States,* D.C.App., 374 A.2d 278, 284 n.9 (1977); *Villacres v. United States, supra,* at 428; *Medina v. United States,* D.C.App., 315 A.2d 169, 171 (1974); *see also* D.C.Code 1973, § 17–305.

We are confident that the remarks did not affect the verdict. *Cf. Taylor v. United States, supra.* As in *United States v. Jones, supra,* 157 U.S.App.D.C. at 164 n.18, 482 F.2d at 753 n.18, the comments were part of one brief passage of the summation. Moreover, their only purpose and potential effect was to persuade the jury that appellant killed Epluribus Thomas in an intentional, unmitigated, cold-blooded manner. The verdict of manslaughter demonstrates that the jury rejected that theory and the prosecutor's remark. Therefore, we conclude that even assuming (without deciding) that the comment was inappropriate, any possible error was harmless.

## IV

■ We also find no error in the trial court's refusal to reopen the case after closing arguments had been made to permit the testimony of an additional defense witness.[2] That witness, George Cobb, apparently would have testified that he saw Clyde Thomas talk with his sister, Victoria, after the shootings, and that Victoria then removed a gun from beneath the front passenger seat of Epluribus Thomas' automobile.

■ Although the determination to reopen a case is within the sound discretion of the trial judge, *see, e. g., Baxter v. United States,* D.C.App., 352 A.2d 383 (1976), we have not previously discussed what standard is applicable to the review of the refusal of a trial judge to reopen a case on the basis of newly discovered evidence after the defense has rested but before the jury has been charged and begun its deliberations. In *Baxter v. United States, supra,* the majority assumed for purposes of discussion that the standard applicable to the grant of a new trial on the ground of newly discovered evidence also was applicable to such a situation. *Id.,* at 386; *see Heard v. United States,* D.C.App., 245 A.2d 125, 126 (1968); *Thompson v. United States,* 88 U.S. App.D.C. 235, 236, 188 F.2d 652, 653 (1951). The dissenting judge in *Baxter,* relying on *Brodie v. United States,* 111 U.S.App.D.C. 170, 295 F.2d 157 (1961), and *Benton v. United States,* 88 U.S.App.D.C. 158, 188 F.2d 625 (1951), contended that the proper standard should focus on whether a reopening of the case is necessary "in the interest of justice." 352 A.2d at 387.

■ We now resolve this question, guided by our general rulings (1) that decisions of the United States Court of Appeals for the District of Columbia Circuit rendered before February 1, 1971, are controlling precedent unless this court sitting en banc rejects them, *see Bethea v. United States,* D.C.App., 365 A.2d 64, 70 (1976); *M.A.P. v. Ryan,* D.C.App., 285 A.2d 310, 312 (1971), and (2) that local court rules of procedure which parallel the federal rules are to be construed in light of the meaning given to the latter. *Walden v. United States,* D.C. App., 366 A.2d 1075, 1077 n.1 (1976); *Campbell v. United States,* D.C.App., 295 A.2d 498, 501 (1972). Super.Ct.Cr.R. 33 and Fed. R.Crim.P. 33, in identical language, govern the granting of new trials. A motion for a new trial on the ground of newly discovered evidence may be made within two years after final judgment, but a new trial may be awarded in the interest of justice if a

2. Appellant first asserted that ruling to be erroneous in a motion for a new trial. That motion

was denied; appellant took no appeal from that denial.

motion is made within seven days (before 1966, five days) after verdict. *Brodie* and *Benton, supra,* make it clear that a more lenient standard applies to a request for a new trial made within the seven-day period, even if that request is based on newly discovered evidence. In *Benton,* the court wrote:

> The motion for a new trial having been filed within five days after verdict, it need not be treated as grounded upon newly discovered evidence and judged by the standards applicable to a motion so grounded. The provision of Rule 33 permitting a new trial if required in the interest of justice, though temperately to be utilized, is broader in scope than the limitations which have been held applicable where the motion is based on newly discovered evidence. [88 U.S.App.D.C. at 160, 188 F.2d at 627, quoted in *Brodie,* 111 U.S.App.D.C. at 173, 295 F.2d at 160.]

In *Brodie,* Judge (now Chief Justice) BURGER stated for the court:

> [T]he trial court's power with respect to a motion [made] within five days is much broader than one made later than five days but within two years relying on newly discovered evidence. [Citation to *Benton.*] Plainly a later motion properly puts the movant under a heavier burden for the passage of time inevitably ripens the finality of the judgment and increases the difficulties of again proving a case. [111 U.S.App.D.C. at 173, 295 F.2d at 160.]

The interest of justice standard calls for a new trial if "a fair trial requires that the [new witness'] testimony be made available to the jury." *Benton v. United States, supra,* 88 U.S.App.D.C. at 160, 188 F.2d at 627 (footnote omitted), quoted in *Brodie v. United States, supra,* 111 U.S.App.D.C. at 173, 295 F.2d at 160. In such a case, "[t]he facts are of critical importance to our consideration of the appeal . . . ." *Brodie v. United States, supra,* 111 U.S.App.D.C. at 171, 295 F.2d at 158.

If the interest of justice calls for a new trial when a new witness with important testimony is found within a week after the verdict, assuredly no stricter standard should be imposed when the cost of granting the motion is only prolonging the trial instead of repeating the entire process.[3] Nothing in the proffered witness Cobb's statement, however, suggests that there was a failure of justice in refusing to allow him to testify. The proffer did not indicate that appellant was aware of the existence of a gun. Nonetheless, the testimony would have been admissible in support of appellant's claim of self-defense as evidence of an uncommunicated threat, *i. e.,* as circumstantial proof tending to raise an inference that the deceased may have been the initial assailant. *Griffin v. United States,* 87 U.S.App.D.C. 172, 183 F.2d 990 (1950), *on remand from,* 336 U.S. 704, 69 S.Ct. 814, 93 L.Ed. 993 (1949); 1 J. Wigmore, Evidence § 110 (3d ed. 1940); McCormick, Evidence § 295 at 700–01 (2d ed. E. Cleary 1972). As was stated in *Wilson v. State,* 30 Fla. 234, 242–43, 11 So. 556, 558 (1892):

> The principle of the admission of threats, under such circumstances, is that they tend to show that it was the intention of the deceased at the time of the meeting to attack the accused, or that he was seeking the latter's life; and hence they tend to prove that the former brought on the conflict, and consequently are relevant evidence.

*See Griffin v. United States, supra,* 87 U.S. App.D.C. at 174, 183 F.2d at 992; *Commonwealth v. Rubin,* 318 Mass. 587, 63 N.E.2d 344, 345–46 (1945).

This jurisdiction does not confine the concept of threats to verbal statements or communicative conduct. In *Griffin v. United States, supra,* a knife in the deceased's pocket was held to be admissible as an uncommunicated threat. Although here

---

**3.** A stricter standard may be necessary where the proffer is made during jury deliberations. Jurors may give undue weight to the new evidence if it appears that the judge thinks it so important that he must interrupt their discussions. *See United States v. Bayer,* 331 U.S. 532, 538–39, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); *Eason v. United States,* 281 F.2d 818, 822 (9th Cir. 1960).

Epluribus lost possible access to the alleged gun when he left the car, evidence that he brought such a weapon to the encounter would have been of some significance in indicating his intentions and evaluating his behavior. Additionally, the testimony could have come in to rebut Clyde Thomas' assertion that he was unarmed. Therefore, had appellant made a timely proffer of this evidence, it should have been admitted.

The interest of justice, however, does not require a new trial because of the trial judge's rejection of this last-minute proffer. We stress the importance of the facts of a particular case in determining whether the trial court acted appropriately. Looking to the evidence adduced, we cannot say that the judge abused his discretion. Although relevant, Cobb's statement would have had limited probative weight. Its significance, for example, was far less than that of the knife in *Griffin v. United States, supra.* While the knife was the only corroboration of the defendant's testimony of self-defense in that case, here—even without Cobb's testimony—appellant presented ample evidence that he acted in self-defense, and that the Thomases were violent, dangerous men with an animus towards him.

Three witnesses testified that two days before the shooting, Clyde Thomas had assaulted a friend of appellant (one of those witnesses stated that Clyde was a party to the assault) and that appellant intervened and stopped the altercation. One witness testified that Clyde then threatened to kill appellant. Three witnesses testified that later that same evening Clyde returned to the scene of that assault (a restaurant parking lot) armed with a shotgun. Two of these witnesses and one other testified that at the same time, Clyde threatened to kill appellant. One witness testified that one day before the shooting, the Thomas brothers had assaulted another friend of appellant (the man from whom appellant later was to obtain the weapons involved here); that Clyde Thomas again brandished a shotgun; that Clyde again threatened to kill appellant; and that he, the witness, informed appellant of these events. Finally, appellant testified that on the night of the shooting, when the Thomas brothers pulled into the convenience store's parking lot, they commanded everyone to freeze or else be shot. This latter testimony alone, if believed, would have supported a finding that appellant acted out of fear for his life.

The factual contrast to the *Benton* and *Brodie* cases, *supra,* is illuminating. The evidence proffered in *Benton,* if believed, would have badly discredited the ten-year-old complainant whose testimony was the basis for the conviction. That offered in *Brodie* would have exonerated the accused had the jury heard and credited it. However, not all relevant evidence which is tardily offered must be admitted. The interest of justice does not mandate that trial judges lack all discretion "to curb the natural tendency of vigorous counsel to get in the final word." *United States v. Greene,* 497 F.2d 1068, 1083 (7th Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). This is true a fortiori where, as here, the proffer was not made until after closing arguments had been made by both sides, meaning that the reopening of the record would have had a particularly disruptive effect on the orderly flow of the trial. *See* footnote 3, *supra.*

Moreover, the proffer itself revealed that Cobb would have been quite vulnerable on cross-examination. His credibility would have been subject to challenge because of both his late appearance and his earlier silent presence in the courtroom. The conclusion to his statement, which was "I don't want Clyde to know what I have told," indicates that even on direct examination his fear was likely to have made him a reluctant, uncooperative witness. Therefore, in light of these potential weaknesses, and giving particular recognition to the extent of the self-defense evidence already adduced, we conclude that the proffered testimony of Cobb was not of sufficient value to warrant our finding that the trial court abused its discretion and defeated the interest of justice by denying its admission.

## V

We also find no error in denying relief because of the claims of some of the jurors

that they had misunderstood the case. Courts consistently have exercised great caution in allowing jurors to impeach their verdicts. This caution is amply warranted for several reasons:

(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; (5) maintaining the viability of the jury as a judicial decision-making body. [*Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 95 S.Ct. 829, 42 L.Ed.2d 839 (1976), *quoted in United States v. Wilson,* 175 U.S.App.D.C. 173, 176, 534 F.2d 375, 378 (1976).]

*See generally McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); Note, *Impeachment of Jury Verdicts,* 53 Marq.L.Rev. 259, 261–62 (1970); Comment, *Impeachment of Jury Verdicts: A Proposal,* 1969 U.Ill.L.F. 388, 388–89. However, these policies do not compel complete disregard of "the injury to the private litigant" caused by jury misconduct, *McDonald v. Pless, supra,* at 267, 35 S.Ct. 783, and the rule against impeachment applies only to "matters which essentially inhere in the verdict itself," *Hyde v. United States,* 225 U.S. 347, 384, 32 S.Ct. 793, 808, 56 L.Ed. 1114 (1912); *accord, Virgin Islands v. Gereau, supra,* at 149, *quoted in United States v. Wilson, supra,* 175 U.S.App.D.C. at 176, 534 F.2d at 378; *Chicago, Rock Island & Pacific Railroad Co. v. Speth,* 404 F.2d 291, 295 (8th Cir. 1968), as opposed to extraneous influences.

 Under this standard, jurors may challenge their verdict on the ground that they had learned of publicity unfavorable to the defendant, *see, e. g., Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); that outside parties had contacted them, *see, e. g., Remmer v. United*

*States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); or that their verdict had been incorrectly reported, *Freid v. McGrath,* 77 U.S.App.D.C. 385, 135 F.2d 833 (1943), *i. e.,* that there had been a clerical error in reporting the verdict.[4]

Another exception appears to be developing, *i. e.,* to allow juror impeachment if necessary for the exposure of violations of the accused's right to have the jury determine his guilt or innocence solely on the basis of the evidence adduced at trial. *See Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Irvin v. Doud,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Marshall v. United States, supra.* Specifically, a number of courts have allowed jurors to impeach their verdicts where they themselves have obtained and considered evidence not admitted at trial. *See United States v. Howard,* 506 F.2d 865 (5th Cir. 1975) (juror disclosure during deliberations of material unfavorable to accused); *Downey v. Peyton,* 451 F.2d 236 (4th Cir. 1971) (same); *United States ex rel. Owen v. McMann,* 435 F.2d 813 (2d Cir. 1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971); *People v. Crimmins,* 26 N.Y.2d 319, 310 N.Y.S.2d 300, 258 N.E.2d 708 (1970) (unauthorized and unsupervised view); *People v. DeLucia,* 20 N.Y.2d 275, 282 N.Y. S.2d 526, 229 N.E.2d 211 (1967) (same, plus juror reenactment of crime charged). *See also United States v. McKinney,* 429 F.2d 1019, *on rehearing,* 434 F.2d 831 (5th Cir. 1970), *cert. denied,* 401 U.S. 922 (1971); *Gafford v. Warden,* 434 F.2d 318 (10th Cir. 1970); *People v. Hollingsworth,* 22 Mich. App. 545, 177 N.W.2d 687 (1970); *State v. Kociolek,* 20 N.J. 92, 118 A.2d 812 (1955); ABA Project on Minimum Standards for Criminal Justice, Trial by Jury § 5.7(c) & Commentary (Approved Draft 1968).

 Nevertheless, a wide range of jury behavior still provides no valid basis for impeachment based upon the jurors' own evidence, for such a behavior range is re-

---

4. A prompt poll, such as the one taken in the present case, ordinarily would detect this sort of mistake. *See Fox v. United States,* 417 F.2d 84, 89 (5th Cir. 1969). Here, as noted, two polls were taken, and each juror thus twice reaffirmed his or her conclusions of guilt.

garded as inhering in a verdict. Thus, jurors cannot impeach their decisions on the ground that they had agreed to a compromise verdict, *see, e. g., United States v. Green,* 523 F.2d 229 (2d Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *United States v. Johnson,* 495 F.2d 1097, 1103 (5th Cir. 1974); that they had bargained to acquit some defendants in order to reach unanimity in convicting others, *Hyde v. United States, supra,* at 382–84; *United States v. Dye,* 508 F.2d 1226, 1233 (6th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); that they had agreed to abide by majority vote, *Jorgenson v. York Ice Machinery Corp.,* 160 F.2d 432 (2d Cir.), *cert. denied,* 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947); *cf. United States v. Wilson, supra;* that they had returned a quotient verdict, *McDonald v. Pless, supra;* that they failed to follow instructions, *see Domeracki v. Humble Oil & Refining Co.,* 443 F.2d 1245, 1247–48 (3d Cir.), *cert. denied,* 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971); that some jurors had pressured others, *see, e. g., United States v. Blackburn,* 446 F.2d 1089 (5th Cir. 1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972); *United States v. Stoppellman,* 406 F.2d 127, 133 (1st Cir.), *cert. denied,* 395 U.S. 981, 89 S.Ct. 2141, 23 L.Ed.2d 769 (1969); that some jurors made improper remarks during deliberations, *United States v. Blackburn, supra,* at 101; *Klimes v. United States,* 105 U.S.App.D.C. 23, 263 F.2d 273 (1959); or that a juror who assented to a guilty verdict did not fundamentally believe in the defendant's guilt. *See Klimes v. United States, supra.* Nor may jurors impeach their verdict on the ground that they had been confused, *Queen v. District of Columbia Transit System,* D.C.App., 364 A.2d 145, 148–49 (1976), or, as claimed in the present case, that they did not understand their instructions. *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 602 n.30 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *United States v. Stacey,* 475 F.2d 1119, 1121 (9th Cir. 1973); *see Chicago, Rock Island & Pacific Railroad Co. v. Speth, supra,* at 295; *United States v. Chereton,* 309 F.2d 197, 201 (6th Cir. 1962), *cert. denied,* 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963); *Walker v. United States,* 298 F.2d 217 (9th Cir. 1962); *cf. Jordan v. United States,* 66 App.D.C. 309, 312, 87 F.2d 64, 67 (1936), *cert. denied,* 303 U.S. 654 (1938). Nor many a post-verdict change of view serve as a vehicle for overturning the verdict. As stated in *United States v. Schroeder,* 433 F.2d 846 (8th Cir. 1970), *cert. denied,* 401 U.S. 943, 91 S.Ct. 590, 27 L.Ed.2d 636 (1971):

> After a jury has given its verdict, has been polled in open court and has been discharged, an individual juror's change of mind or claim that he was mistaken or unwilling in his assent to the verdict comes too late. [*Id.,* at 851 (footnote omitted).]

■ In this case, several of the jurors stressed that they did not misunderstand the court's instructions. Those instructions were correctly given, and we follow the well-established rule that jurors may not impeach their verdict. Accordingly, we decline to disturb the ruling of the trial court.

The convictions were amply supported by the evidence, and no reversible error was committed by the trial court.

*Affirmed.*

MACK, Associate Judge, concurring and dissenting in part:

While I concur with the majority on the issues presented in Parts I through IV, I must respectfully dissent to the conclusion reached in Part V.

I am acutely aware that the public policy reasons for exerting caution in the area of jury verdict impeachment are well established and warrant this court's deference. However, where a misinterpretation of law causes at least two-thirds of a jury to convict a defendant they have intended to absolve of criminal liability, serious constitutional questions of due process arise. I therefore think that, under these circumstances, a court is compelled to balance the possible public injury of undermining verdict finality against the possible private in-

jury to a litigant amounting to deprivation of a constitutional right.

The record in this case shows that on Monday following a jury verdict of guilty of manslaughter, returned on Thursday, the foreman wrote the court:

> Dear Honorable Hannon,
>
> The unanimous decision of the jury in the case of the United States versus Andre Sellers was that he killed in self-defense. However, the verdict that we announced, and verbally agreed to in open court, did not convey that verdict. Therefore, we request that the jury be reconvened so that we can rectify our error.
>
> Thank you for your consideration.
>
> Herbert A. Brown
> Foreman

Thereafter the court reconvened in chambers for a hearing with the twelve jurors, the parties and counsel present. At this time, juror after juror (nine in all) testified under oath in essence: "I understood manslaughter was [killing in] self defense", "Self defense was what I was aiming at"; "I was saying that he was acting in self defense"; "the verdict in the jury lounge is that he acted in self defense." Only three of the jurors testified that they adhered to, or meant to convict of, manslaughter. It is against this backdrop that we must assess the trial court's denial of post-conviction motions, including motions to vacate the verdict and for judgment of acquittal.[1]

The threshold question is whether such testimony would be admissible to test the validity of a verdict. The general rule proscribing impeachment of jury verdicts establishes a major exception, which permits the introduction of juror evidence tending "to prove something which did not essentially inhere in the verdict . . . ." *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). Thus, for example, while evidence is not admissible to show the mental processes by which a verdict is determined, testimony is admissible to show extraneous matters coming to the attention of one or more jurors which might interfere with a constitutional right. *See Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

Juror confusion on instructions *per se* would be classified as a matter which inheres in the verdict itself (*United States v. Chereton,* 309 F.2d 197, 201 (6th Cir. 1962)); and I agree that the clear weight of authority would indeed suggest that a juror's testimony attesting to such confusion should not be admissible. *See* ABA Standards Relating to Trial by Jury § 5.7(a) at 171.

Nevertheless, in examining the rationale for the no-impeachment rule, there is room for a less than wooden application. Public policy reasons for protecting the verdict are less persuasive when applied to other than the more intimate and personal aspects of jury deliberations. *See* ABA Standards, *supra* at 170. Thus *Mattox v. United States, supra,* suggests that the rationale for disallowing a matter resting in the consciousness

---

1. The court correctly instructed as to self-defense, in part:

> As I've said to you, the defense in this case is *self defense.* So what, then are the elements of self defense which is required to consider in connection with this case?
>
> Every person, ladies and gentlemen has a right to use a reasonable amount of force in self defense if he actually believes that he is in imminent danger of bodily harm and if he has reasonable grounds for this belief. The question is not whether you believe, in retrospect, that the use of force was necessary. The question is whether the defendant, under the circumstances *as they appeared to him at* the time of the incident, actually believed he was in danger of bodily harm, and could reasonably hold that belief.

> The defendant is not required to prove that he acted in self defense.
>
> If evidence of self defense is present, the Government must prove beyond a reasonable doubt that the defendant did not act in self defense. If you find that the Government has failed to prove beyond a. reasonable doubt that this defendant did not act in self defense, in connection with the actions he took against both Epluribus Thomas and Clyde Thomas, you must find the defendant not guilty. In other words, if you have a reasonable doubt whether or not the defendant acted in self defense, your verdict must be not guilty.

of one juror to impeach a jury verdict is the inaccessibility of juror mental process to the testimony of other jurors:

> Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony. It gives to the secret thought of one the power to disturb the expressed conclusions of twelve. . . . But as to overt acts, they are accessible to the knowledge of all the jurors. . . . [*Id.* at 148–49, 13 S.Ct., at 52–53, *citing Perry v. Bailey,* 12 Kan. 539, 545 (1874).]

However this case does not present a situation where a juror was required to testify as to personal mental processes in reaching a conclusion, or where the secret consciousness of one, if inquired into, could be used to overthrow the conclusions of others. Here the jury knew that two-thirds of its members had concluded that the defendant was not criminally liable. Here it was possible for nine jurors to [and they did] testify to this conclusion of nonculpability as a fact and also to their acceptance of an erroneous legal definition in *expressing* (as opposed to reaching) this fact of nonculpability.

The issue here, therefore, is not so much one of the impeachment of a verdict as it is one of ascertaining the true verdict or whether there was a verdict at all. *See Freid v. McGrath,* 77 U.S.App.D.C. 385, 135 F.2d 833 (1943).

If an agreement reached in the jury room is not correctly expressed in the verdict returned into open court, relief is not foreclosed by the no-impeachment rule. *See Young v. United States,* 168 F.2d 242, 247

(10th Cir.) (Phillips, J., concurring), *cert. denied,* 334 U.S. 859, 68 S.Ct. 1533, 92 L.Ed. 1779 (1948); *Young v. United States,* 163 F.2d 187 (10th Cir.), *cert. denied,* 332 U.S. 770, 68 S.Ct. 83, 92 L.Ed. 355 (1947).

In the instant case the error in reporting nonculpability was promptly brought to the attention of the court on the second business day after its return and on the jury's own volition. All twelve jurors were reassembled in chambers for a complete inquiry which confirmed the error. The court was empowered to correct the verdict so that it would express the conclusion reached and agreed upon by the jury or, in the alternative, to determine that no verdict had been reached. In my view, it was an abuse of discretion for the trial court to reject partly on the strength of its own assessment of the record,[2] the jury's request to correct the record.

We have here a case distinguished by a unique set of facts requiring a remedy in the interest of justice. In the exercise of this court's supervisory power I would create a narrow exception to the general rule disallowing jury verdict impeachment. I would reverse[3] and remand the case for the vacation of the judgment of guilty on the manslaughter charge and order a new trial.

---

**2.** In denying the defense motions, the court orally observed:

> The Court is very conscious of the fact . . . that nine of those jurors indicated on a Monday morning and subsequently when interrogated by the Court that they felt Mr. Sellars acted in self defense. But the Court has very, very carefully considered the record in this case and the Court agrees with the three jurors that say he is guilty of involuntary manslaughter. The evidence in this case is overwhelming. It leaves no question

of doubt in my mind but that he is guilty of involuntary manslaughter, if not of second degree murder.

The court's written order addressed and relied upon no-impeachment concepts.

**3.** The government, in its pleadings before the trial court, conceded that under the facts of this case the finality of the jury's deliberation might have well been called into question if the defendant had moved for a new trial on this ground.