Eugene Duvalcourt WALKER and Irving
Goldheimer, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 17382.

United States Court of Appeals
Ninth Circuit.

Jan. 17, 1962.

**218**

Robert W. Armstrong, Huntington Park, Cal., for appellant Walker.

Russell E. Parsons, Harry E. Weiss, Los Angeles, Cal., for appellant Goldheimer.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Crim. Div., Meyer Newman, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, MERRILL and BROWNING, Circuit Judges.

BARNES, Circuit Judge.

Appellants Walker and Goldheimer, together with defendants Wilson, Medina and Mendez, were indicted on two counts of violating Title 21 United States Code Annotated, §§ 174, 176. The first count charged that beginning on or about July 13, 1960, and continuing to August 30, 1960, appellants together with other named defendants conspired together to knowingly and unlawfully receive, conceal, transport and facilitate the concealment and transportation, and sell and facilitate the sale, of heroin which the defendants knew had been imported into the United States contrary to § 173, Title 21, United States Code Annotated; to knowingly smuggle and clandestinely introduce into the United States from Mexico, *heroin* with intent to defraud the United States (which merchandise should have been invoiced prior to importation into the United States) in violation of § 174, Title 21, United States Code.[1] The second count charged that during the same period appellants, and other defendants, violated the same law with respect to marihuana (21 U.S.C.A. § 176).[2]

Appellants pleaded not guilty to both counts and were tried by jury.

The jurisdiction of the district court was found upon 18 U.S.C. § 3231. This court has jurisdiction to hear the appeal

---

1. 21 U.S.C.A. § 174 provides in part as follows:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

2. 21 U.S.C. § 176a provides in part as follows:
"§ 176a. Smuggling of marihuana; penalties, evidence; definition of marihuana.

"Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marihuana contrary to law, or smuggles or clandestinely introduces into the United States marihuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marihuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing acts, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *

"Whenever on trial for a violation of this subsection, the defendant is shown to have or to have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury.

"As used in this section, the term 'marihuana' has the meaning given to such term by section 4761 of the Internal Revenue Code of 1954."

and review the judgments under the provisions of 28 U.S.C. §§ 1291 and 1294.

## Facts

Because of alleged insufficiency of the evidence to support each conviction, it becomes necessary to consider it in some detail.

James R. Webster, a special employee of the Federal Bureau of Narcotics, testified that he met Goldheimer in a jail in Long Beach, California, in the latter part of May 1960, that Goldheimer told him that he had been to Mexico, that he had narcotics sources there and that he had previously imported marihuana from Mexico to New York and that he had just returned from Mexico not long prior to his arrest, and that he had an associate or friend who had a boat and that they were intending to import a large quantity of marihuana "up to this area"; that they had the "contacts on the Mexican side 'all lined up.'" Webster further testified that he met Donald Wilets, an agent of the Federal Bureau of Narcotics, on June 3, 1960, and on June 23, 1960, and outlined to Wilets the conversations he had with Goldheimer.

On June 29, 1960, Webster met Goldheimer and Walker and was asked, by Goldheimer, if he wanted to see the boat. While on the yacht Goldheimer (Walker not being present) showed Webster certain nautical charts and told him that he and Walker had one chart on which they had worked out a course to some point below Ensenada with a landing area where "a transshipment could be made of the narcotics on board the vessel." During a conversation that night, Walker stated that the best plan, and what he intended to do, was to have the narcotics wrapped in waterproofed packages, compressed, and put into sail bags (which are canvas bags that are put on or below decks when the ship is at sea, and which are usually empty when the sails are being used). Walker also stated that he was not absolutely sure of the customs formalities in returning from a foreign run on a yacht and that he was going to check into it. In discussing finances Goldheimer stated that he had some money on deposit with one Bryce Wilson in Guadalajara; that if their venture was successful Goldheimer, Walker, Wilson and Webster were each to receive twenty-five per cent of the total profits above expenditures and that Webster was to put some money into the enterprise depending on the final amount of narcotics that was to be handled.

On June 27, 1960, Webster had suggested to Goldheimer that he meet his financial backer. Goldheimer had previously expressed a desire to meet him. On July 13, 1960, Webster and Wilets met Goldheimer at a restaurant on the Sunset Strip and Goldheimer told Wilets that there were narcotics available through his sources and that a source of transportation, a yacht, was readily available.

On July 14, 1960, Goldheimer, Walker, Webster and Wilets, met together at a restaurant and then went for a ride during which Goldheimer asked Webster and Wilets how the plan "looked" and Walker asked if Wilets were going to "front any money."

On July 28, 1960, Webster met Goldheimer who said he would be ready to go to Mexico the following day and requested Webster to make all the arrangements. Arrangements were made and on the next day Wilets drove Webster out to pick up Goldheimer and then drove Webster and Goldheimer to the airport. The conversation in the car concerned bringing the matter "to a head" and obtaining a clear commitment down below on what they were supposed to get. Webster and Goldheimer deplaned at Guadalajara but they could not find Wilson there, and Goldheimer then left Guadalajara and flew to Puerto Vallarta, and returned the following day with Wilson. Goldheimer told Webster that Wilson had spent his money and that they would go to the Jalisco State Jail in Guadalajara the following day to meet with one of the sources of supply. They went to the prison where they met an inmate named Talaveras with whom they discussed the availability of heroin; it

was learned that marihuana was available in a week or two but that Talaveras did not know about the heroin but that he would send someone out to see about it. One Ramundo was contacted and he stated that there was a kilogram of heroin available in a week or two and that the price would be $10,000. Webster said the price was too high but Goldheimer and Wilson said that it was a fair price and Goldheimer also stated, "Well that's the price its always been." Webster and Goldheimer returned to their hotel with Wilson and when Goldheimer went with Wilson to the hotel at which Wilson was stopping, Webster called Wilets and outlined what had happened in the jail. Webster, Goldheimer and Wilson returned to the jail a few days later and Webster stated that $10,000 would be acceptable but that he would want a firm delivery date and Ramundo stated that there would be a kilo available on August 14, which could be held until August 21. Goldheimer suggested that the heroin and marihuana should be bought at one time for one delivery on the yacht and Talaveras said that the marihuana would be available at the same time as the heroin. Ramundo then gave Wilson, Webster and Goldheimer the name and address of a man outside of the prison whom he said was the heroin and opium connection. Ramundo's "connection" was a man named Medina and his name and address were written by Ramundo on a slip of paper which he gave to Wilson.

After leaving the jail the plans for delivery were discussed in Guadalajara by Wilson, Goldheimer and Webster and Wilson said he would go back to his home and that he would return to Guadalajara on August 14, at which time he would meet Medina to get a sample of the heroin and that he would then forward a sample to Webster in the United States.

Goldheimer said that nothing should be done about the marihuana until the heroin was obtained so that it could be put together in one package and one delivery could be made. It was agreed that Goldheimer and Webster would return to Guadalajara on August 21, after having received the heroin sample in the United States, and that in the meantime Wilson would remain in Guadalajara and see about getting the marihuana together and starting to package it. Goldheimer said he would contact Walker to arrange for a final delivery of the heroin and the marihuana by them to Walker in Ensenada. Webster stated that as to the payment for their trip to Mexico, Goldheimer had given him a $100 bill but said that he was a little short and Webster paid the remaining $37.50 for the tickets and that in addition he had purchased lunch for Goldheimer several times in Mexico but that he had given him no other funds. Webster and Goldheimer returned to the United States together on August 4, and they were met at the airport by Wilets. Goldheimer told Wilets that arrangements had been made to pick up both heroin and marihuana in Guadalajara on August 21, and that it had been decided to make it a package deal so that the heroin would not be imported without the marihuana and the price was $10,000.[3]

Another meeting was held between Webster, Walker, Goldheimer and Wilets on August 10, and after a cup of coffee in a restaurant they drove around and discussed the arrangements that had been made.[4] Due to the fact that Goldheimer had to make a court appearance and would not be able to return to Guadalajara on August 21, alternate arrangements had to be made and it was decided that Webster and Wilets would go to Mexico to receive delivery. Webster

3. An electronic recording device had been installed in the car and the entire conversation during the car ride had been recorded on tape. These tapes were identified as Exhibits 1A, 1B and 1C and were introduced into evidence.

4. When these discussions were conducted in Wilets' car they were being recorded on a tape recorder which Wilets had placed in the car. The recordings were identified and introduced into evidence as Exhibits 2A, 2B and 2C.

could then return to the United States on August 22 and Goldheimer could follow them down in order to transport the narcotics from Guadalajara to Ensenada. During the conversation Wilets wanted to know how the marihuana was to be packed and Walker said it was to be packed as tightly as possible and wrapped in waterproofed containers so that just in case it was necessary to kick them overboard it could be done, although he (Walker) envisioned no problem. Walker also stated that he would be ready on twenty-four-hour notice to meet Webster or Wilets or any of the coconspirators at a pick-up point in Lower California. He asked for an advance of $250 to defray the costs of renting a boat but he did not receive this sum. On August 18, Webster returned to Mexico; driving to Tijuana with Wilets, then flying on to Guadalajara alone. But when he reached Guadalajara he did not find Wilson, so he left by plane the next day for Puerto Vallarta where he located Wilson. Wilson would not return to Guadalajara with Webster as he stated that he had to go to Jalapa and Webster then accompanied Wilson and his wife to that town. Webster inquired why nothing had been done and why no sample had been received, and Wilson stated that he did not have the funds to stay in Guadalajara but that he had gone there anyway and found that the heroin which he thought was available was not available; that he had met with Medina concerning this; and that he was returning to Jalapa to wait for a letter from Medina stating when the heroin was available. Wilson returned to Guadalajara with Webster, where they met Agent Chappell of the United States Bureau of Narcotics. Wilson told Chappell and Webster that he was sorry the deal had not gone off as originally scheduled and that he did not think that it was quite final enough to convince the people from whom they were buying. Wilson said that now that Chappell and Webster were both on the scene he (Wilson) would get everything rolling at once. Wilson suggested that he and Webster go back to the penitentiary to see Talaveras who was the contact man for Medina so they could once again talk to Medina. Talaveras sent them to Medina and Wilson, Chappell and Webster had a discussion with Medina at a bar in Guadalajara in which Medina stated that he was sorry he had not made the delivery but that he did not quite believe the whole thing was real and that he thought that somebody was trying to get a kilo of heroin reserved in case he could raise the money; but that since the parties were on the scene Medina would be able to supply the heroin on one week's notice. Wilson inquired whether it would be possible to get the heroin before one week, but Medina said they would have to get the opium from the fields and process it through their laboratory to make the heroin and that it would take about a week; Medina said there was no problem with the marihuana. A meeting was arranged for two days later so that Chappell, Wilson, Webster and Medina could talk to the man who was the grower and who supplied the opium. His name was Mendez and the meeting was held at a hotel in Guadalajara; Wilson was not present at this meeting.[5] At the meeting Mendez told Chappell that he had the opium but that it would take about a week to make it into heroin. Chappell got into a disagreement with Medina and Mendez. The latter wanted Chappell, Wilson and Webster to go to Uruapan (an Indian village about one hundred miles from Guadalajara, up in the mountains) because they were not too sure that the others were not federal agents and they were worried about federal agents in Guadalajara and also did not want to take the chance of being highjacked by

5. At this point counsel for Goldheimer objected to the introduction of evidence of the conversation at this meeting as not binding upon anyone who was absent and the court stated that it could only be binding upon anyone who was absent if it was connected up to show a conspiracy and that the indictment did allege that Medina and Mendez were members of the conspiracy.

other entrepreneurs. Chappell took .the position that he did not want to take the chance of being in a remote Mexican village with large sums of money. It was finally decided that Wilson would go with Medina and Mendez to Uruapan and would accompany them to the farm to inspect the narcotics.[6] At the meeting the delivery date was set for August 28 and Chappell and Webster were to wait in Guadalajara for a telephone call from Wilson which came late on the night of the 28th.

On that night Chappell and Webster accompanied by Mexican narcotics agents drove to Uruapan. On the morning of the 30th they met Wilson in Uruapan and Wilson told Chappell that there was 500 kilos of marihuana and 15 kilos of opium at Mendez's farm and that Mendez had brought five kilos of opium to Uruapan to show that the narcotics were available.

Webster, Wilson, Chappell and a Mexican narcotics agent then proceeded to a hotel room where Mendez and Medina were present; Chappell requested to see the narcotics and Mendez left the room and returned with a shopping bag which he put on the bed and from which he extracted a shoe box. Chappell looked at the contents and confirmed that it was opium and then went in to brush his teeth, extracted a revolver from a handbag and placed Wilson, Medina and Mendez under arrest. The opium seized at that time weighed approximately two kilos.

Under cross-examination Webster testified that Goldheimer had given him his telephone number while they were in jail together in Long Beach; also he reaffirmed his testimony that when Goldheimer had shown him certain charts or maps on the yacht he had displayed one to him and said: "We have one all set up." As to his discussion with Wilets, he stated that Wilets specifically instructed him to appear to go along with Goldheimer "but not to lead him." He was told to contact Goldheimer but was instructed to "let them make the first move." Webster stated that he was told by Wilets after he had described the conversation which he had had with Goldheimer and Walker, that "if there is a conspiracy I am to go along with it; but that I wasn't to attempt to build a case."

Corroborative testimony was given by Agent Chappell, agent in charge of the Los Angeles office of the Federal Bureau of Narcotics, and Agent Wilets. Appellants Goldheimer and Walker testified in their own behalf.[7]

At the conclusion of all testimony, both sides rested; the court instructed the jury; and, after deliberation, the jury returned verdicts of guilty as charged in each count against each appellant. A judgment of twenty years was entered on both counts, to run concurrently, against each appellant. From the verdict and judgment, appellants appeal to this court.

## Specification of Errors

Appellant Goldheimer contends the following errors were committed by the trial court:

"1. The Court erred in denying defendant and appellant's motions to grant a judgment of acquittal and in denying the motions for new trial. Entrapment was conclusively proven.

"2. The defendant and appellant was denied a fair trial by reason of incidents occurring during the course of the trial, and particularly, the instruction of the trial court on the question of entrapment.

"3. As a matter of law, the guilt of the defendant was not established. The evidence was not sufficient, even if the evidence by all of the Government's witnesses is to be

---

6. There was an objection by defense counsel that the proceedings testified to were hearsay as to the appellants and the court again gave cautionary instructions on the question of conspiracy.

7. The statement of facts is condensed from the testimony of Webster; Chappell and Wilets corroborated this evidence. Appellee sets forth a detailed and exhaustive statement of facts in its brief, pp. 5-22.

fully believed, as must be the situation here."

Appellant Walker contends the following errors were committed by the trial court:

"1. The Court erred in denying defendant and appellant's motion to grant a judgment of acquittal and in denying the motion for a new trial.

"2. The evidence was insufficient to support the verdict against Appellant Walker.

"3. The defendant and appellant was denied a fair trial by reason of rulings made during the course of the trial and particularly the instruction of the trial court on the question of entrapment which was an improper statement of the law.

"4. That the Court erred in refusing to consider the affidavits filed in support of the motion for new trial, particularly since the misunderstanding set forth therein was occasioned by the improper instructions of the Court on the law of entrapment.

"5. The Court erred in admitting testimony of Agent Chappell whose testimony related incidents which were beyond any schemes or plans known to Appellant Walker."[8]

I

The Defense of Entrapment

 Appellants rely on two leading Supreme Court cases to support their argument that the law of entrapment is applicable to their cases.

The first is Sorrells v. United States, 1935, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. The facts of that case clearly distinguish it from the instant case. In Sorrells the Court reversed a conviction, holding that the district court was in error when it refused to submit the defense

of entrapment to the jury, and held that there was no entrapment as a matter of law. In the instant case, the district court did submit the issue to the jury under the principles enunciated in Sorrells, and even made reference, as an example, to the facts of the Sorrells case. The record supports appellee's contention that this issue was submitted to, and determined by, the jury. Thus, Sorrells v. United States, supra, is not in point.

The second case cited by appellants is Sherman v. United States, 1958, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848. In Sherman the facts clearly indicate that entrapment was shown as a matter of law. There the defendant was not "in the trade" and attempted to avoid narcotics; i. e., he repeatedly refused to discuss narcotics with the government's informer. The two met while supposedly taking medical treatment for addiction. The informer, a supposed addict, appealed to the sympathy of the defendant, a former addict who was trying to cure himself of the habit. The informer gradually wore the defendant's resistance down. The defendant finally consented to the scheme offered by the informer. In Sherman, the Court stated, in holding that entrapment was established as a matter of law, that it was not choosing between conflicting witnesses, nor judging credibility; but was reaching its conclusion from the undisputed testimony of the prosecutor's witnesses. The Court, in the Sherman case, supra, stated:

"It is patently clear that petitioner was induced by [the informer].— The informer himself testified that, believing petitioner to be undergoing a cure for narcotics addiction, he nonetheless sought to persuade petitioner to obtain for him a source of narcotics. In [the informer's]— own words we are told of the accidental, yet recurring, meetings, the ensuing conversations concerning

---

8. Though appellants submit separate briefs, several questions are common to both; Walker's brief raises two additional questions which are not presented in

Goldheimer's brief. The common questions will be treated first; Walker's two additional questions being treated in conclusion.

mutual experiences in regard to narcotics addiction, and then of [the informer's]—resort to sympathy. One request was not enough, * * * additional ones were necessary to overcome, first, petitioner's refusal, then his evasiveness, and then his hesitancy in order to achieve capitulation.—[The informer] not only procured a source of narcotics but apparently also induced petitioner to return to the habit. Finally, assured of a catch, [the informer]—informed the authorities so that they could close the net. The Government cannot disown—[the informer] and insist it is not responsible for his actions. * * * In his testimony the federal agent in charge of the case admitted that he never bothered to question—[the informer] about the way he had made contact with petitioner. The Government cannot make · such use of an informer and then claim disassociation through ignorance." (356 U.S. ₹73–375, 78 S.Ct. 821.)

The record of the instant case clearly shows that the conduct of the government agents did not approach that found in the Sherman case. Here, Agent Wilets questioned Webster. When Webster initially contacted Wilets, he was specifically instructed to go along with Goldheimer "but not to lead him"; Webster was told to contact Goldheimer but was instructed to "let him [Goldheimer] make the first move." Webster further testified that he had been cautioned by Wilets after Webster had reported the conversations he had had with Goldheimer and Walker; Wilets told Webster: "If there is a conspiracy * * * go along with it; but * * * [do not] attempt to build a case." When Webster called Wilets to report the happenings on the first trip to Mexico, Wilets again cautioned Webster "to let Goldheimer lead, not to try to take over himself." Whether the jury accepted such testimony at its face value, we do not know, but it did have the right to so accept it.

The record does not indicate that appellants made the slightest attempt to avoid contact with narcotics. They freely discussed narcotics, and their introduction into this country. They were not addicts; Webster made no appeals to their habits; supplied them with no narcotics; and there was no gradual wearing down of their resistance. We cannot believe the Sherman case, supra, is in point.

The instant case more closely parallels the case of Masciale v. United States, 1958, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed. 2d 859, which case was decided by the Supreme Court on the same day as Sherman v. United States, supra, was decided. The contrast between the two cases is revealing.

In Masciale, as in the case of Goldheimer, the appellant was acquainted with the government's special employee without knowing that the latter was an undercover agent. There, as here, the government agent was introduced as a man with money interested in talking about and buying large quantities of high grade narcotics. Here, as in Masciale, appellant could have withdrawn from the conversations, or refused to conduct further meetings, but instead appellants had additional meetings and conversations and Goldheimer discussed his "contacts" in Mexico and his plan to smuggle narcotics into the United States; Walker with full knowledge of this plan agreed to join the conspiracy as the water transportation specialist. He explained how the narcotics should best be packaged, and requested funds with which to charter a boat.

Where did the criminal design originate? It was Goldheimer who had the "contacts" in Mexico, and knew where to find them. The government had no prior knowledge of Walker's sailing ability, it was Goldheimer who induced Walker to join the conspiracy. It was Walker who had previously observed the laxness of customs officials in inspecting private pleasure vessels; it was he who devised the plan of wrapping the narcotics in the sailing bags, and it was he

who volunteered to study further the customs procedures at ports of entry to the United States in order to assure success.

This court has repeatedly held,[9] following the rationale of Masciale, supra, that when the issue of entrapment is present, and there is conflicting testimony and credibility factors are involved, the trial court cannot fulfill its functions unless it submits the issue to the jury. It is then that the jury may, on the evidence submitted, determine whether the criminal design originated with the defendants and thereby find, as it did here, for the prosecution on the issue of the defendants' guilt, or that the criminal design originated with the government's agents, and constituted entrapment.

Entrapment was not proved as a matter of law, and the trial court properly submitted the issue to the jury.

## II

### Court's Instructions on Entrapment

■ Appellants contend that they were denied a fair trial because the trial court commented on the law of entrapment in such a way as to "emasculate" the instructions given on entrapment to the jury. The instructions given the jury, and the court's comments on entrapment, are set forth on pages 426–430 of the transcript. The appellants contend that these instructions and comments resulted in a denial of a fair trial. We cannot so read them. But if we could, we note that the court asked each side whether they were satisfied with the instructions, as they were given with comments. The court asked:

"Now, are there any matters that either side wish to take up before the jury finally retires to deliberate on the verdicts?"

Each counsel replied that they were satisfied to have the case then submitted to the jury. No exceptions were taken to any instructions given the jury before it retired for its deliberation.

Rule 30 [10] provides in pertinent part:

" * * * No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * * "

Having failed to comply with Rule 30, and not contending that plain error [11] had been committed, and because the instructions taken as a whole and read together do not appear prejudicial, the appellants are barred from presenting this issue on appeal.

## III

### Agent Chappell's Testimony

■ Appellants contend that the testimony of Agent Chappell should not have been admitted and that its admission was highly prejudicial to their case.

We do not believe the admission into evidence of this testimony was erroneous under the pleading of conspiracy. The jury was admonished by the court and the court gave instructions relating to the law of conspiracy.

It should be noted that this testimony covered events which terminated on August 29, 1960; that the indictment alleged a conspiracy which continued to August 30, 1960; and that the evidence does not indicate that either appellant had withdrawn, or that the conspiracy had terminated, prior to August 29, 1960.[12]

---

9. Matthews v. United States, 9 Cir., 1961, 290 F.2d 198; Young v. United States, 9 Cir., 1960, 286 F.2d 13; Hattem v. United States, 9 Cir., 1960, 283 F.2d 339; Cellino v. United States, 9 Cir., 1960, 276 F.2d 941; Bruno v. United States, 9 Cir., 1948, 259 F.2d 8.

10. Fed.R.Crim.P. 30 (18 U.S.C.A.).

11. Fed.R.Crim.P. 52(b) (18 U.S.C.A.).

12. On September 5, 1960, Goldheimer met Wilets to discuss the status of the operation and four days later, on September 9, 1960, Goldheimer and Walker met with Wilets to discuss and plan the final phase of the operation—still unaware of the fact that Wilets was a federal officer.

■ Chappell's testimony mainly concerns admissions and declarations made by Wilson, or other unindicted coconspirators, to him with regard to the operations and scheme from which the conspiracy was formed. It is well settled that every act or declaration of each member of the conspiracy in furtherance thereof, while the conspiracy is in operation, is considered the act or declaration of each member of that conspiracy. Barnett v. United States, 9 Cir. 1949, 171 F.2d 721.

## IV

### Sufficiency of Evidence as to Walker

■ While Walker did not participate as actively in the conspiracy as did Goldheimer, a review of the record indicates that appellant Walker was actively interested in participating in the plan to smuggle narcotics into the United States; that it was agreed he was to perform one of the vital functions in the conspiracy (that of providing the transportation, and transporting the narcotics into the United States), and that he at no time withdrew from his participation in the conspiracy.

■ It is apparent therefore that there was sufficient evidence to go to the jury concerning Walker's participation and role in the conspiracy. It is well settled that, on review, the evidence must be viewed in the light most favorable to the government.[13] Glasser v. United States, 1941, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. Under such an examination, there exists ample evidence to include Walker as a conspirator. That he received the same sentence as did a more active participant is a matter of the trial court's discretion—concerning which we legally have nothing we can say.

## V

### The Juror's Affidavit

■ Appellant Walker offered an affidavit of a juror in support of his motion for a new trial; the affidavit concerns, not extrinsic matters or pressures on the jury, but an alleged misconception by the jurors of the court's instructions on entrapment. This same question was presented in Rotondo v. Isthmian Steamship Lines, 2 Cir., 1957, 243 F.2d 581, 583, where the court said:

> "The motion wholly misconceives the law relating to this subject. There have indeed been cases where the court has set aside a verdict because evidence was brought before the jury outside of court. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, is the leading decision upon that point. However it is completely well settled that, when objection rests upon the juror's testimony as to what were the reasons that in fact induced them to find their verdict, the court will not hear them."

The Supreme Court discussed this same question—and some of the considerations therein involved—in Stein v. People of State of New York, 1953, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522, where it said:

> " 'If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation [of the jury within the jury room], the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.' [Citation.]" (346 U.S. at 178, 73 S.Ct. at 1089.)

We believe the trial court properly refused to consider the affidavit offered by appellant Walker. Therefore the trial court's denial of a new trial was proper.

The judgment of conviction as to both appellants is affirmed.

13. Appellant Walker in his brief at p. 27 admits that he entered into a "purported conspiracy to import narcotics into the United States"; "His whole defense was based upon the fact that he was unlawfully entrapped * * *." (Br. 23.)