757 P.2d 1222

**Donald J. LEHMKUHL and Jill Lehmkuhl, husband and wife, Plaintiffs–Appellants,**

v.

**Herbert M. BOLLAND, Defendant–Respondent.**

No. 16775.

Court of Appeals of Idaho.

June 16, 1988.

Petition for Review Denied July 11, 1988.

J.D. Hancock of Smith & Hancock, Rexburg, for plaintiffs-appellants.

Michael D. Gaffney of Quane, Smith, Howard & Hull, Pocatello, for defendant-respondent.

SUBSTITUTE OPINION

The Court's prior opinion, dated February 1, 1988, is hereby withdrawn.

WALTERS, Chief Judge.

This is an appeal from an order denying a motion by the plaintiffs Donald and Jill

Lehmkuhl for new trial, in a personal injury action tried to a jury. Because we conclude the jury's verdict was contrary to the clear weight of the evidence, we reverse the order denying the Lehmkuhls' motion, and we remand for a new trial.

Certain facts in this case are undisputed. They are as follows. On December 12, 1984, shortly after 5:00 p.m., Donald Lehmkuhl was driving a Dodge Colt automobile he had recently purchased, in a southerly direction along U.S. Highway 20 approximately one and one-half miles south of Ashton, Idaho. Lehmkuhl was being followed in another car by his stepfather, Harry Housley. It was getting dark and there was some snow on the road surface. The Dodge suffered electrical problems, causing Lehmkuhl to pull over to the west shoulder of the highway. After parking the car, Lehmkuhl continued with Housley in the latter's vehicle to the Lehmkuhl residence. There they picked up a battery and returned north to the disabled vehicle, in a Ford pickup truck belonging to Lehmkuhl. When they arrived at the location of the Dodge, Lehmkuhl crossed the highway and positioned his pickup truck directly in front of and facing the disabled Dodge. Lehmkuhl left the pickup's headlights on. Lehmkuhl and Housley got out and began to repair the Dodge. Lehmkuhl raised the hood on the automobile in order to replace the battery. In the meantime, Herbert Bolland was driving south on Highway 20 from Ashton. When Bolland approached the Lehmkuhl vehicles, he collided with the left rear portion of Lehmkuhl's disabled Dodge. Both Lehmkuhl and Housley, who were standing between the Dodge and Lehmkuhl's Ford pickup, were injured as a result of the collision. They sued Bolland. Lehmkuhl's wife, Jill, also sued for loss of consortium resulting from her husband's injuries. Bolland counterclaimed.

At trial, the dispute centered on the precise location of the Lehmkuhl vehicles *pri-* or to the accident. Bolland asserted the Lehmkuhl pickup was improperly parked with a portion of the pickup protruding into the southbound lane. He testified that the right headlamp of Lehmkuhl's pickup gave him the impression that a vehicle was occupying his traffic lane and he pulled to his right, into the emergency lane, to avoid a collision. To the contrary, Lehmkuhl maintained that his pickup truck was completely within the boundary of the emergency lane. The deputy sheriff who responded to the accident was unable to produce any recording of measurements from the accident scene but did "guess" that the Lehmkuhl pickup was improperly parked. The deputy also estimated the damage to the Lehmkuhl vehicles at approximately $2500. An accident reconstructionist testified that, from studying photographs of the damaged vehicles and tire marks, the pickup truck was not parked in the southbound traffic lane. Various other witnesses offered conflicting recollections regarding the pickup's location.

The jury returned a special verdict finding Harry Housley not negligent in causing the accident. The jury awarded him $2500 in damages.[1] The jury found Donald Lehmkuhl fifty percent at fault and awarded no damages to him. The verdict also awarded no damages to Jill Lehmkuhl. Further, the jury found Herbert Bolland fifty percent at fault and awarded him no damages on his counterclaim.

After the Lehmkuhls' motion for a judgment notwithstanding the verdict (or in the alternative, for a new trial) was denied, a judgment consistent with the verdict was entered. The Lehmkuhls then filed this appeal. The Lehmkuhls contend (1) the district court erred in not granting their motion for a new trial or for judgment n.o.v., asserting the verdict was against the weight of the evidence and the law; (2) the district court erred in not allowing the Lehmkuhls' counsel an opportunity to read

---

1. Although Harry Housley participated as a plaintiff in this action, he did not join in the appeal. Solely for the purposes of this appeal, therefore, we entered an order modifying the caption to delete Housley's name from among the parties on appeal.

and consider jury instructions prepared by the court, outside the presence of the jury, prior to the giving of those instructions; (3) error was committed when the district court failed to give certain instructions requested by the plaintiffs; (4) the court erroneously assessed costs against Jill Lehmkuhl in the absence of finding that an offer· of judgment had been made to her; and (5) error was committed by the court in not admitting evidence concerning Bolland's driving at a time several hours prior to the accident.

From our review of this case, we conclude that Lehmkuhls' first issue raised on this appeal is dispositive. We hold that the district court should have granted a new trial on the grounds of insufficiency of the evidence to support (1) a finding of fifty percent negligence on the part of Donald Lehmkuhl, and (2) a finding that Donald Lehmkuhl suffered no damages. Upon those two points, the jury's verdict is not in accord with the clear weight of the evidence.

Because we hold that a new trial should be granted in this case, we also will provide guidance to the trial court on another issue raised by the Lehmkuhls: the admission of evidence concerning Bolland's driving several hours before the accident. As to that issue, we sustain the trial court's exclusion of the evidence.

I

*Motion for New Trial*

On review of an order denying a motion for new trial predicated upon the sufficiency of the evidence, we are not concerned with whether there is substantial evidence upon which the jury rendered its verdict—as would be the case in reviewing an order denying a motion for judgment n.o.v. Rather, the pertinent standard is whether the trial judge abused his discretion in failing to find that the verdict was against the clear weight of the evidence.

In approaching the issue of whether a new trial should be granted on grounds of insufficient evidence to support a jury's verdict, we find guidance in our Supreme Court's recent unanimous opinion in *Garrett Freightlines, Inc. v. Bannock Paving Co., Inc.*, 112 Idaho 722, 735 P.2d 1033 (1987). In that case, a jury had determined that both Garrett and Bannock Paving were equally negligent in causing a multiple-vehicle collision at a construction site on the interstate freeway. Bannock Paving's motion for a new trial was denied by the trial court and Bannock appealed, contending the evidence at the trial did not support the jury's assessment of negligence, causation and concomitant liability. The Supreme Court reviewed the evidence adduced at the trial and concluded that, although there was evidence of negligence on the part of both Garrett and Bannock Paving, "no reasonable jury could have found, as the jury in the present case found, that the negligence of Bannock was equal to the negligence of the Garrett truck driver." 112 Idaho at 728–29, 735 P.2d at 1039–40. The Court specifically determined that the jury's finding of equality of negligence was "against the great weight of the evidence." 112 Idaho at 729, 735 P.2d at 1040. The Court concluded: "Because the jury's verdict in the present case was against the great weight of the evidence, the trial court erred in denying Bannock's motion for a new trial." 112 Idaho at 730, 735 P.2d at 1041 (citing I.R.C.P. 59(a)(6) and *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986)).

We are faced with a similar situation in the present case. Our review of the evidence reveals the following. Don Lehmkuhl related that he parked his Dodge on the west side of the fog line. In order to avoid any interference with the southbound lane of traffic, he parked his Ford pickup directly in front of the Dodge, to the west of the fog line, with its lights on dim and with its emergency flashers on. With respect to their claimed losses resulting from the accident, the Lehmkuhls also submitted out-of-pocket expenses for medical bills and vehicular damages totaling $5,281.75.

The next witness who testified was Burt Bates, a Fremont County deputy sheriff.

He did not take any measurements and he was not aware of the exact location of the vehicles prior to the accident. Deputy Bates merely testified from the conclusions which he had recorded on his accident report. Deputy Bates did admit that it was not unusual for vehicles to be parked in the posture described by Lehmkuhl, given the particular circumstances involved.

The plaintiffs next called as an expert witness Cpl. Arnold O. Young, with the Idaho State Police. Young indicated that the emergency lane was being correctly used by Lehmkuhl at the time of the accident. Officer Young further testified that it was very "abnormal" for a vehicle to run off the right side of the road into the emergency lane and then collide with a disabled vehicle that was legitimately stalled in the emergency lane on the west side of the fog line.

Two doctors, Dr. Sam Richard and Dr. Henry G. West, testified with respect to injuries sustained. Dr. West established that in his opinion Don Lehmkuhl had a fifteen percent impairment of the whole man and that Harry Housley had a five percent permanent partial impairment.

Charles L. Rawson testified that he had gone to Ashton earlier in the evening and had seen the Dodge automobile parked off to the side. He later came by the scene immediately following the accident. He said he did not encounter any problem in going south past the accident scene.

George Amen, who operated a wrecking service in Ashton, testified that when he arrived at the scene the four-way flashers were still blinking on Lehmkuhl's pickup. Because he, Amen, didn't know how to turn the flashers off, he had to ask for assistance to turn off the flashers when he delivered the damaged vehicle to the Lehmkuhls' residence.

The plaintiffs' next witness was Scott Phelps. Phelps testified that before the accident he passed the parked Dodge automobile and Ford pickup while he was headed in a southbound direction, and that he saw the flashers on the pickup. He testified that both of those vehicles were well off the main traveled portion of the highway.

The collision between the Bolland and Lehmkuhl vehicles occurred near the home of a family named Perry. Lisa Perry testified that, as she and her boyfriend drove north into Ashton prior to 7:00 o'clock, she noticed that the lights were flashing on the pickup. Anita Perry stated that as she went to the accident scene she saw the pickup lights flashing, and that the pickup's headlights were on. Mitch Ghormley, the ambulance driver, testified that, in his opinion, Lehmkuhl could not have gotten his vehicles any farther off the road. Robin Stephens testified that when she drove past the accident scene the pickup flashers and headlights were on. She also verified that she assisted Jill Lehmkuhl in taking pictures and measurements the next day; and that all of the imprints in the snow—where the vehicles had been and where the victims were thrown—were still clearly visible.

Jill Lehmkuhl testified that when she made the measurements the day after the accident, everything had remained substantially the same as the night before. Mrs. Lehmkuhl also testified to the loss of consortium which the accident caused her personally and the adverse effects which the accident had upon her husband, Don Lehmkuhl.

Harry Housley verified where the Dodge and Lehmkuhl's Ford pickup were parked preceding the accident. He stated that before he got out of the pickup he and Mr. Lehmkuhl discussed turning on the emergency blinkers or flashing lights. He stated that, in his opinion, the pickup was parked so far to the west side of the road that he was afraid that they would "tip off in the gutter."

David Lord, an accident reconstruction expert, reviewed the relevant factors involved, explaining why and how the accident happened. He utilized measurements made by Jill Lehmkuhl. In reconstructing

the chain of events, Lord analyzed reasonable probabilities and physical facts in order to determine the interaction of all forces relating to this particular accident. He outlined the chain of events and then drew his conclusions. He explained that it was physically impossible for the Lehmkuhl pickup to have protruded into the traveled portion of the roadway as asserted by defendant Bolland. He discounted Deputy Bates' contrary "guess." He stated that Mr. Bolland's testimony (detailed below) presented a question of Mr. Bolland's ability to perceive what was actually there and to take appropriate action as would be expected of a reasonable and prudent driver.

Meredith Dexter was called by the defendant as a witness. He testified that, as he drove along the highway, he saw both Lehmkuhl vehicles before the accident and he carefully drove past them.

Defendant Bolland admitted that he saw the Ford pickup lights a quarter of a mile away in front of him. Mr. Bolland stated that he took his foot off the accelerator approximately 400 yards away from the Lehmkuhl vehicles. Regarding a margin of error in his calculations, he acknowledged that he may have been some 200 feet away when he took his foot from the accelerator. Upon examination by his attorney, Mr. Bolland then changed his testimony. He related that maybe he was 500 feet away when he saw the vehicles and at that time he took his foot off the accelerator. The reconstructionist, Mr. Lord, opined that had any of these versions of Mr. Bolland's story been true, Bolland would have been able to stop prior to reaching either of the Lehmkuhl vehicles. Lord concluded, from the damage which was done in the area of impact and by the physical factors involved, that Mr. Bolland had been traveling between 25 and 35 miles per hour at the time of impact, and had veered into the emergency lane or had been traveling in the emergency lane at the time he struck Lehmkuhl's Dodge.

Bolland argues that there was a conflict in the evidence as to whether the Lehmkuhl vehicles were properly within the emergency lane where Lehmkuhl and Housley were attempting to repair the disabled Dodge. However, the great weight of the evidence indicates that Mr. Bolland primarily caused the accident by driving over the fog line on the west edge of the traveled southbound lane of traffic and striking the Dodge automobile. The impact injured Don Lehmkuhl and Harry Housley, who were between the Dodge and the Ford pickup.

Our Supreme Court in *Garrett Freightlines, Inc. v. Bannock Paving Co., Inc.*, 112 Idaho 722, 735 P.2d 1033 (1987), recently said:

> It is well settled law in this jurisdiction that a person operating a motor vehicle has a duty to keep a proper lookout. *Robinson v. Westover*, 101 Idaho 766, 768, 620 P.2d 1096, 1098 (1980).
>
> > "It is not only the duty of the operator to look, but it is his duty to see and be cognizant of that which is plainly visible or obviously apparent, and the failure on his part in this regard, without proper justification or reason, makes him chargeable for failure to see what he should have seen had he been in the exercise of reasonable care." *Id.*, quoting *Drury v. Palmer*, 84 Idaho 558, 564, 375 P.2d 125, 128 (1962).

*Id.* at 729, 735 P.2d at 1040. As in *Garrett*, here we conclude that the jury's assessment of negligence equally between Bolland and Don Lehmkuhl was against the great weight of the evidence. Similarly, the jury's finding of no damage was contrary to the evidence. We deem it likely that a different result would follow in this case on a retrial. *Blaine v. Byers*, 91 Idaho 665, 429 P.2d 397 (1967). Accordingly, we hold the district court abused its discretion in denying the Lehmkuhls' motion for a new trial.

Before we leave the new trial issue and move to the evidentiary question discussed in Part II of this opinion, we deem it appropriate to address another matter raised on

the motion for new trial. It relates to an "insurance" instruction and the use of juror affidavits to impeach the jury's verdict. The Lehmkuhls postulate .that the jury's verdict relieving Bolland of any responsibility for the Lehmkuhls' damages (by assessing negligence equally between those parties) resulted from a belief by the jury that Bolland was uninsured and would be forced personally to pay for the Lehmkuhls' losses.

The record shows that the jury was given an instruction (IDJI 101) relating to insurance, at the commencement of the trial and before any evidence had been presented.[2] IDJI 101 is reflective of Rule 411 of the Idaho Rules of Evidence. The purpose of IDJI 101 and Rule 411 is to assure that jurors reach their conclusions on liability based solely upon the facts at issue and upon the merits of the case, rather than upon passion or prejudice which may arise from unwarranted consideration of insurance coverage. In their motion for a new trial, Lehmkuhls offered affidavits from three jurors to support their contention that the jury reached its verdict using improper consideration of insurance. The affidavit of Harold Nebeker is most specific:

2. It is my understanding from the Court's instructions that had we found for Mr. Lehmkuhl, Mr. Bolland would have personally had to pay for any damages to Lehmkuhls. The Court instructed us that no insurance was involved or to be considered.

3. *Originally the percentages* of negligence between Don Lehmkuhl and Herb Bolland *were not equal,* but in order to prevent personal payment from Mr. Bolland to Lehmkuhls, we made the percentages equal. [Emphasis added.]

■ These affidavits however, are not admissible to impeach the jury's verdict. It is well established in this state that a jury may not impeach its verdict by affidavit or testimony. *Robinson v. White,* 90 Idaho 548, 414 P.2d 666 (1966); *Dawson v. Eldredge,* 84 Idaho 331, 372 P.2d 414 (1962); *State v. Bedwell,* 77 Idaho 57, 286 P.2d 641 (1955); *Hall v. Johnson,* 70 Idaho 190, 214 P.2d 467 (1950); *Moyer v. Hyde,* 35 Idaho 161, 204 P. 1068 (1922); *Bernier v. Anderson,* 8 Idaho 675, 70 P. 1027 (1902); *Griffiths v. Montandon,* 4 Idaho 377, 39 P. 548 (1895). Subsequent to these cases, Idaho adopted I.R.E. 606(b) which is patterned directly after its F.R.E. counterpart. This rule provides as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be

**2.** Idaho Civil Pattern Jury Instruction (IDJI) 101, as given by the trial court in this case, states:

No insurance company is a party to this action. You must refrain from any inference, speculation or discussion about insurance.

Any questions that were asked in the examination of prospective jurors about an interest in a casualty insurance company were for the sole purpose of discovering the possibility of a biased viewpoint.

According to a supplemental brief and supporting affidavit filed by Bolland's counsel after oral argument on this appeal, the instruction was given because one of the potential jurors, during voir dire, "spontaneously volunteered that her mother worked for an insurance company which provided liability coverage to one of

the parties involved in this lawsuit." Counsel represents that the trial court immediately instructed the prospective jurors to disregard the presence or absence of insurance in addressing the issues involved in the lawsuit. Bolland's counsel then proposed, and the court gave, IDJI 101 (as above quoted) to the jurors selected to decide the case. Apparently, the parties waived making a record of the voir dire proceeding by the trial court reporter. The clerk's minutes of the trial (Clerk's Record p. 112) indicate that the jury selection process was electronically tape-recorded. Nonetheless, we have not been provided with any transcript of the jury voir dire portion of the trial. The record is thus silent with regard to whether any questions were asked of the prospective jurors about casualty insurance.

received for these purposes, but a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror and may be questioned about or may execute an affidavit on the issue of whether or not the jury determined any issue by resort to chance.

The rule represents the codification of an exclusionary principle dating back to early English common law which prohibited jurors from impeaching their verdicts. The reasons for excluding evidence attempting to impeach the verdict include insuring the freedom of deliberations, the stability and finality of verdicts and the protection of jurors. As stated in *McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915),

> let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.

The modern form of the rule

> seeks to reach an accommodation between policies designed to safeguard the institution of trial by jury and policies designed to insure a just result in the individual case. It does so by drawing the dividing line between inquiry into the thought processes of the jurors on the one hand, and inquiry into the existence of conditions or the occurrence of events calculated to exert an improper influence on the verdict, on the other.

3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE § 606(03) at 606–26 (1982).[3]

The federal rule, as with Idaho's, presents this line between an allowed inquiry into extraneous prejudicial information and a prohibited inquiry into the thought processes of the jurors. The application of the rule has prevented challenges to verdicts including misapprehension of the evidence or impressions as to the effect of findings, *Moores v. Navitrade S.A. of Panama*, 94 F.R.D. 340 (D.Me.1982); *Morgan v. Sun Oil Co.*, 109 F.2d 178 (5th Cir.1940), *cert. denied*, 310 U.S. 640, 60 S.Ct. 1086, 84 L.Ed. 1408 (1940); that a juror ignored or misunderstood the law, *U.S. v. D'Angelo*, 598 F.2d 1002 (5th Cir. 1979); what theory or ground upon which a verdict is rendered, *Pletchas v. Von Poppenheim*, 148 Colo. 127, 365 P.2d 261 (1961); that the jury agreed with or believed in the verdict, *U.S. v. Gerardi*, 586 F.2d 896 (1st Cir.1978).

As noted, the Lehmkuhls offered the juror affidavits in an attempt to demonstrate that the jury reached its decision based upon the belief that a verdict against Bolland would force him to personally pay for any damages. The affidavits alleged that this belief arose from the court's instructions that no insurance was involved or to be considered. The operation of 606(b) excludes the use of the affidavits as presented by the Lehmkuhls, an attempt to impeach the verdict by a juror's testimony concerning his misunderstanding of the instructions issued to the jury. *Wilkerson v. Amco*, 703 F.2d 184 (5th Cir.1983); *U.S. v. Neary*, 552 F.2d 1184 (7th Cir.1977); *U.S. v. Stacey*, 475 F.2d 1119 (9th Cir.1973); *Walker v. U.S.*, 298 F.2d 217 (9th Cir.1962); *Bryson v. U.S.*, 238 F.2d 657 (9th Cir.1956); *Shillcutt v. Gagnon*, 602 F.Supp. 1280 (E.D.Wis.1985); *U.S. v. Kimberlin*, 527 F.Supp. 1010 (S.D.Ind.1981); *Pessin v. Keeneland Assoc.*, 298 F.Supp. 593 (E.D. Ky.1969).

---

**3.** *See also* M. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE (1986); 3 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE (1979); 65 A.L.R.Fed. 835 (1983 & Supp.1985) (competency of juror as witness, under F.R. Evidence 606(b), upon inquiry into validity of verdict or indictment); 76 AM.JUR.2d *Trial* § 1219 (1975) (impeachment of verdict by evidence of jurors).

The affidavits presented by the Lehmkuhls were clearly an inquiry into an area prohibited from review by I.R.E. 606(b). A review of the internal deliberative processes of the jury is prohibited under the rule unless affected by extraneous prejudicial information or an outside influence. In accordance with this rule these affidavits cannot be considered as a basis for a motion for new trial.

## II

### Evidence of Defendant's Driving

■ We turn next to an evidentiary issue. It concerns the relevance of evidence of Bolland's driving, three or four hours before the collision with Lehmkuhl's vehicle. We address this issue for guidance in the event the same evidence is offered on retrial of this case.

Don Lehmkuhl testified that, immediately following the collision, he talked to Bolland while Bolland was still seated in his own vehicle. Lehmkuhl testified that he thought he smelled the odor of alcohol at that time. Later in the trial, the plaintiffs called a Mr. Lenz as a witness. Lenz was acquainted with Bolland. He was asked by Lehmkuhls' counsel whether he had seen Bolland on the date of the accident. Bolland's counsel interrupted and obtained permission from the court to interrogate the witness in aid of an objection. In response to that interrogation, Lenz indicated he did not observe the Lehmkuhl–Bolland accident, but that he could testify regarding "some type of conduct of Mr. Bolland at some other time and some other location during the day [of the accident]." At that point, Bolland's counsel objected to Lenz's testimony, asserting the testimony was not material nor causally related to the accident in question.

The jury was excused and Lehmkuhls' counsel made an offer of proof, through further examination of Mr. Lenz. Lenz testified that on the afternoon of the day of the accident, while he was "hauling a load of spuds" on the highway, Mr. Bolland's vehicle came toward him. Lenz said he had "to take evasive action to avoid a collision" because "[h]e was across the centerline in my side of the road." The evasive action consisted of "dodg[ing] over to the right-hand side of the road."

According to plaintiffs' counsel, Lenz's testimony—concerning Bolland's driving three or four hours before the collision with the Lehmkuhl vehicle—was offered to corroborate Don Lehmkuhl's testimony that he detected the odor of alcohol coming from Bolland's car immediately following the accident. The trial court sustained the defense objection to Lenz's testimony, ruling that the proffered evidence was too remote in time to be probative of the issue before the court.

The Lehmkuhls argue that remoteness in time affects only the weight of the evidence and not the admissibility of the evidence, citing Blankenship v. Brookshier, 91 Idaho 317, 420 P.2d 800 (1966). Their contention is not entirely accurate. Granted, if the evidence is admitted, then its remoteness in time with respect to the issue in dispute may be considered in determining the weight to be given the evidence. But the threshold inquiry presented, as in the case at bar, is whether the probative value of the evidence is sufficiently strong to render the evidence admissible in the first instance, in light of its alleged remoteness. Succinctly stated, the "remoteness of the proffered evidence from the issue being proved may be considered in determining probative value under [I.R.E.] 401." Comment to Rule 401, REPORT OF THE IDAHO STATE BAR EVIDENCE COMMITTEE, at C 401 p. 2 (4th Supp.Rep.1985). In this regard, we recently noted:

> As evidence goes back further in time— that is, becomes remote—it is entitled to decreasing weight. At some point it becomes so remote that it no longer tends to make a fact "of consequence ... more probable or less probable" and, therefore, is inadmissible because it is not relevant under Idaho Rule of Evidence 401.

*Roeh v. Roeh,* 113 Idaho 557, 559, 746 P.2d 1016, 1018 (Ct.App.1987).

The determination of whether the proffered evidence lacks probative value because of remoteness in time rests in the sound discretion of the trial court. *Evans v. Park,* 112 Idaho 400, 402, 732 P.2d 369, 371 (Ct.App.1987), citing *Blankenship, supra.* Here, we are not persuaded that the trial court abused its discretion in deeming the evidence of Bolland's driving, three or four hours before the accident, too remote to be probative of the issues before the court. We uphold the exclusion of that evidence.

In summary, the order of the district court, denying the Lehmkuhls' motion for a new trial, is reversed. The case is remanded for a new trial. Costs to appellants, Lehmkuhls. No attorney fees are awarded.

SWANSTROM, J., concurs.

BURNETT, Judge, specially concurring.

I join the Court in holding that the district judge abused his discretion by failing to set aside a verdict which was against the clear weight of the evidence. Our holding rests, as it must, upon the evidence itself, not upon the juror affidavits presented in contravention of I.R.E. 606(b). However, those affidavits point to a separate problem that could arise again on remand. They show how the language of IDJI 101, the pattern instruction on insurance, may be misinterpreted by a jury.

As noted in the Court's opinion, the first paragraph of IDJI 101 reads as follows: "No insurance company is a party to this action. You must refrain from any inference, speculation or discussion about insurance." The policy embodied in IDJI 101 is that a jury should not find the facts or apply the law differently in cases where insurance exists than in cases where it does not exist.[1] Unfortunately, the instruction expresses this policy poorly. It does not explain why the possibility of insurance should be disregarded. Rather, it attempts to "hide the ball" from the jury by making the literally correct but wholly misleading statement that "[n]o insurance company is a party to this action." At best, this language may amuse those modern jurors who know that insurance companies need not be named as parties in order to have a stake in litigation. At worst, the language may cause impressionable jurors to do what the jury allegedly did here—interpret the instruction as a warning that the defendant is uninsured.

If a jury tailors its findings to avoid imposing liability upon a supposedly uninsured defendant, the reviewing court faces an insoluble enigma. Has the jury deviated from a "true" verdict in order to protect the vulnerable defendant? Or has the jury rendered a "true" verdict because there appeared to be no opportunity to tap a "deep pocket?"

Such ambiguity can be prevented, and the policy underlying IDJI 101 can be implemented more effectively, if we candidly tell jurors why they should not speculate about insurance. Jurors should be informed that insurance does not always exist and that their function is the same regardless of insurance. The following language is offered as an illustration:

> You must not speculate as to whether any party to this lawsuit has insurance. In some cases there is insurance; in other cases there is not. In either event, your job is the same. It is to reach a verdict solely upon the evidence and upon the principles of law contained in these instructions.

---

1. This policy does not prohibit all mention of insurance in the courtroom. IDJI 101 contains optional paragraphs explaining that insurance may be mentioned during voir dire for the limited purpose of probing for juror bias. Rule 411, I.R.E., further allows evidence of liability insurance to be admitted during trial for purposes other than to prove negligence or wrongful conduct. Moreover, in some types of litigation, the scope of recoverable damages may be affected by the existence of insurance. None of these exceptions, however, alters the fundamental objective of keeping jury verdicts insurance-neutral.

This language is consistent with pattern instructions found in other jurisdictions.[2] The trial judge in the present case may wish to consider giving such an instruction on remand. Rule 51(a)(2), I.R.C.P., allows a judge to depart from an IDJI instruction whenever he or she finds that "a different instruction would more adequately, accurately or clearly state the law." I submit that the goals of accuracy and clarity will be better achieved when we discontinue our efforts to "hide the ball" from Idaho juries.

---

2. Washington and Illinois employ the following standard instruction: "Whether a party is or is not insured has no bearing whatever on any issue that you must decide. You must refrain from any inference, speculation or discussion about insurance." *See* Washington Pattern Instruction No. 2.13 and Illinois Pattern Instruction No. 2.13 (same number). California uses the following language, focusing specifically upon a defendant's liability insurance:

There is no evidence before you that the defendant has or does not have insurance against the plaintiff's claim. Whether or not such insurance exists has no bearing upon any issue in this case and you must refrain from any inference, speculation or discussion upon that subject.
*See* California Book of Approved Jury Instructions (BAJI) No. 1.04.